UNITED STATES, Appellee

v

JOHN C. WEAVER, JR., Sergeant, U. S. Marine Corps, Appellant

9 USCMA 13, 25 CMR 275

`14

*Commander Charles Timblin,* USN, argued the cause for Appellant, Accused.

*Lieutenant Colonel Charles H. Beale, Jr.,* USMC, argued the cause for Appellee, United States. With him on the brief were *Commander Guilbert W. Martin,* USN, and *First Lieutenant Daniel P. Reardon, Jr.,* USMCR.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of wrongfully having in his possession 27 grams of marihuana. Intermediate appellate authorities affirmed his conviction, and he brought this appeal on four assignments of error.

First, it is alleged that the law officer erred to the substantial prejudice of the accused by failing to disclose during the challenge procedure that he had previously served as law officer in United States v Bullard, WC NCM 56–01405, a "closely related case." The asserted ground for challenge is not one of the grounds for ineligibility set out in Article 26(a) of the Uniform Code of Military Justice, 10 USC § 826. Neither is it one of the specific grounds for challenge enumerated in the supplementary provisions of the Manual for Courts-Martial. However, it is listed as an "example" of the kind of challenge that can be interposed "in the interest of having the trial . . . free from substantial doubt as to legality, fairness, and impartiality." Manual for Courts-Martial, United States, 1951, paragraph 62*f*(13). See United States v Fry, 7 USCMA 682, 23 CMR 146.

The Manual provision seems to include the law officer among those who can be challenged on the ground of having "participated in the trial of a closely related case." In the civilian community a judge is not ordinarily disqualified from serving in one case merely because he served earlier in a related case. See United States v Fry, supra. It is arguable, therefore, that the broad prohibition of the Manual is not intended to apply to the law officer. For the purpose of this case only we will assume that the law officer is subject to challenge if he previously participated in a closely related case. We will also assume that if the record of trial showed that this case and United States v Bullard are "closely related" and that the law officer here served in that case, trial counsel or the law officer should have disclosed the ground for challenge. United States v Schuller, 5 USCMA 101, 105, 17 CMR 101. The testimony contains a number of references to the *Bullard* case but its connection with this case is not clearly delineated. Moreover, none of the references indicate that the law officer acted in that capacity at the *Bullard* trial. Accordingly, we are asked by the accused to take judicial notice of the *Bullard* record of trial for proof of the relation between the two cases and of the law officer's participation in both.

We need not decide whether we can, or should, under the circumstances of this case, take judicial notice of the *Bullard* record of trial. United States v Lovett, 7 USCMA 704, 23 CMR 168. Cf. United States v Meadow, 13 CMR 783; United States v Moses, 11 CMR 281. For the purposes of this case we assume that both records of trial are

**15**

properly before us. It appears from the record that defense counsel at the accused's trial also acted as defense counsel in the *Bullard* case. In similar situations boards of review have held that the error of non-disclosure is waived by defense counsel's failure to interpose a challenge for cause. United States v Meadow, supra; United States v Moses, supra; United States v Reid, 7 CMR 459. However, application of the doctrine of waiver raises a serious problem concerning the extent to which an accused can be charged with the knowledge acquired by his counsel in the course of another case for a different accused. Cf. United States v Schuller, supra, in which the Government alleged that the knowledge of prior participation was acquired by the accused's counsel in the course of the same case. The ramifications of this problem need not detain us. See Ildvedsen v First State Bank, 24 ND 227, 139 NW 105; Griffin v Franklin, 224 Mo 667, 123 SW 1092. It clearly appears that, as part of the proceedings in this case, defense counsel consulted the record of trial in the *Bullard* case.

In the course of the cross-examination of a Government witness, defense counsel attempted to impeach her by asking a number of questions regarding her recollection of the testimony she gave at Bullard's trial. Later, he requested a continuance to examine the testimony "in the prior case to see whether my accusations were proper or improper." The request was granted. When the court reconvened, defense counsel presented a stipulation to the effect that "the record in the case of U. S. versus Bullard . . . shows" that the Government witness testified to certain particulars. Since counsel consulted the record of trial in the *Bullard* case, ordinary diligence on his part would have disclosed that the law officer there was the same as the one here. Consequently, if the law officer was to be challenged on the ground of prior participation, the challenge should have been presented when the court reconvened. The failure to act at that time constitutes a waiver of the ground for challenge. In United States v Thomas, 3 USCMA 161, 167, 11 CMR

161, we said: "A failure to act . . . if the ground of objection is known, or by the exercise of ordinary diligence, might have been determined, constitutes a waiver of the objection." See also United States v Wolfe, 8 USCMA 246, 24 CMR 57.

For his second claim of error, the accused maintains that evidence of the discovery of marihuana in his quarters in the Marine Corps Barracks at Yermo, California, and in the locked trunk of his automobile was inadmissible because obtained through an illegal search. The search was conducted by Captain E. R. Laine, Jr., and Technical Sergeant Nelson A. Working, Provost Marshal and Chief Investigator, respectively, of the Marine Corps Supply Center, and a deputy sheriff of San Bernardino County, California. According to Captain Laine, he had general authority to order the search from the Commanding General of the Supply Center, and specific authorization from the Commanding Officer of the Administrative Branch of the Center, who also had delegated authority to order searches under the provisions of a Center general order. Captain Laine testified that he informed the Administrative Branch head that he had received a report from a reliable informer that the accused was in possession of narcotics. He notified the Branch head of "the tentative plans" that had been made for a search. The Branch head gave him "his approval . . . and the word to go ahead" since the Commanding General was not present. In pertinent part, the general order delegating authority to search provides as follows:

"Ref: (a) Center General Order No. 119

(b) Para 152, Manual for Courts-Martial, United States, 1951

• • • • •

2. The following order is issued in connection with the searching of military personnel, their clothing and/or property in their possession or control.

3. In accordance with reference (b), the Commanding General hereby delegates authority to direct the

searching of military personnel, their clothing and/or property in their possession or control, to the following persons:

 a. Chief of Staff
 b. Officer in Charge, Yermo Area
 c. Officer in Charge, Daggett Area
 d. Center Provost Marshal
 e. Assistant Provost Marshal
 f. Officer of the Day
 g. Assistant Staff Duty Officer, Yermo Area
 h. Assistant Staff Duty Officer, Daggett Area
 i. Head of Branch, Repair Branch, Administrative Branch, Services Branch and Supply Branch

. . . . .

6. A search of public or private quarters occupied by military or civilian personnel of this Command will not be instituted under a consent agreement or on the basis of a warrant without the prior permission of the Commanding General. Authority to grant such permission is hereby delegated to the Chief of Staff and the Head of Administrative Branch."

The accused construes the general order as establishing a condition precedent to the exercise of the ▆▆▆▆▆ delegated authority to search the quarters of military personnel. He argues that paragraph 3 is limited to the search of property other than quarters, and that quarters can be searched only if the search is instituted under a consent agreement or a warrant. This construction is inconsistent with the scope and purpose of the order.

The order applies to the search of both person and property. Paragraph 3 is explicit in that regard. Since living quarters constitute "property in . . . [the] possession or control" of a person it appears that authority to order a search extends to such areas. The provisions of paragraph 6 do not conflict with this construction. By its terms that paragraph applies only to a search which is instituted under a consent agreement or on the basis of a warrant. These conditions imply a

search, in conjunction with civilian authorities, of areas not under the same direct control of the Commanding General as the barracks of a military installation. From that standpoint, paragraph 6 does not limit but amplifies the provisions of paragraph 3. However, even if we construe paragraph 6 as applying to military quarters such as those occupied by the accused, it furnishes strong support to our construction of paragraph 3.

If, as contended by the accused, paragraph 3 did not delegate authority to search military quarters, paragraph 6 is meaningless; it would purport to restrict a power which had not been granted. On the other hand, if the draftsman of the general order intended paragraph 3 to constitute a general grant of authority to search quarters, paragraph 6 is an understandable and consistent limitation. In the specific situation of a search of quarters on the basis of civilian process rather than the order of a designated military commander, prior approval is required by the Commanding General himself or his two principal aides, who are authorized to act in his stead. In United States v Padilla, 1 USCMA 603, 5 CMR 31, we pointed out that when alternative constructions of a writing are possible, the one selected should be that which gives meaning and purpose to the document. In our opinion, the general order here designated authority to search the quarters, as well as the person, of the members of the Center, to the officials enumerated in paragraph 3. The law officer, therefore, correctly ruled that the evidence obtained in the search was admissible because "authority [to conduct the search] was granted by one who properly had the authority" under the provisions of the general order. United States v Doyle, 1 USCMA 545, 4 CMR 137.

The basis of the law officer's ruling also disposes of the accused's contention that he improperly imposed ▆▆▆▆▆ upon the accused the burden of proving the illegality of the search. In United States v Berry, 6 USCMA 609, 20 CMR 325, we held that when objection is made to the admission of evidence obtained as a

**17**

result of a search, the burden of justification of the search rests upon the Government. Here, defense counsel objected to the introduction of evidence concerning the search "until it is shown the authority to search." After some discussion on whether the objection was premature, the law officer agreed to consider it. Trial counsel then argued that the "mere assertion of illegality" is not sufficient. The law officer remarked that "that is quite obvious." The accused maintains this statement shows that the law officer believed the burden of proving illegality was on the accused. However, we find no evidence of such a belief in the remark.

Certainly the mere assertion that a search is illegal is an insufficient basis upon which to make an informed ruling. Inquiry into the basis, and the circumstances, of the search must be made. And that is exactly what the law officer proceeded to do. He proposed an out-of-court hearing on the matter. Defense counsel indicated that the evidence could be presented before the court members because "the defense objection will be to the authority," and that evidence would not be prejudicial to the accused. A full hearing was then held on the reasons, and the authority, for the search. After both sides had rested and final arguments had been made, the law officer ruled that the "evidence . . . before me evidences the fact that authority was granted by one who properly had the authority." Nothing in this ruling suggests that the law officer required the accused to prove the illegality of the search. On the contrary, he determined that the evidence affirmatively showed proper authorization, and, therefore, it was legal.

In his final assignment of error the accused contends that the law officer abandoned his role of judge "to fill in . . . omissions" in the prosecution's case and to impress the court members with "the idea that the accused was a liar." Support for this contention is sought in the law officer's examination of a Government witness who was called to rebut part of the accused's testimony.

For its case in chief, the prosecution showed that cigarettes containing mari-

huana were found in a package hidden among the steam pipes on the wall in the accused's room, and that the same substance was in two wax paper bags taken from a "week-end bag" belonging to the accused, which was removed from the locked trunk of his car.

In his defense, the accused introduced evidence of his good character and his reputation for trustworthiness. He then took the stand and testified that he had been occupying the room for only two weeks, and that he did not "realize the presence" of the package among the steam pipes. As for the valise found in his car, he maintained that there was nothing "of this nature" in the bag when he last looked at it, which was "a little over a month" before the search. He had no "idea" how the marihuana got in it. He further testified that in the interim period other persons had been in and around his car during a time when the trunk was unlocked. In that connection, he was asked by his counsel if he had ever lent his car to Bullard. He replied that he had never done so, and that as far as he knew Bullard was never in the car. On cross-examination trial counsel asked him if he had not told Captain Laine that he had lent his car to Bullard on the day of the search. He denied that he made such a statement. In rebuttal, trial counsel called Captain Laine who testified that, after the accused had been warned of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, he questioned him in connection with the case. The accused told him that he had loaned his car that day to Bullard. On cross-examination defense counsel inquired as to whether the accused's statement had been reduced to writing. Informed that it had not, counsel continued his examination as follows:

"Q. Is there any reason why they were not reduced to writing?

"A. Yes, we checked out the statement and it was found to be untrue.

"Q. And any statement which you consider to be untrue, then, is not reduced to writing. Is that correct?

"A. No, not necessarily. The purpose of the interrogation was to try

to determine the source of the illegal narcotics; and since **we got no in**formation relative to this source, we wrote nothing down.

"Q. Did you get any information relative to narcotics at all from the accused? Or were you just dealing with the automobile?

"A. From the accused? No.

"Q. I thought I understood you, on direct, Captain, to say, 'I don't recall, but I think he had ridden with someone else.' Do you remember whether he said he had ridden with someone else to the rifle range that day or not?

"A. After the check-out of the story about loaning his car to Corporal Bullard, and after Weaver was informed that we knew otherwise, he mentioned this incident of the flat tire, and that he had left his car unlocked in the Yermo Area. He said he was firing the range that day, and I understood him to say that he rode to the range with another marine in another vehicle.

"Q. He said his car was left unlocked during that day, is that correct?

"A. That's correct."

With the cross-examination of Captain Laine completed, the law officer asked him a series of 14 questions. Since they form the basis of the accused's claim of error, we set them out below:

"Q. Captain, you said you had checked on the statement of Weaver and found it to be false. To what extent did you find it to be false?

"A. We had Weaver taken out of the interrogation room and we called in Corporal Bullard. We asked him if he had borrowed a car, and he said, 'Yes,' he had borrowed a car. He gave a marine's name other than the name of the accused. So we brought this marine in, and we talked to him and he said, 'Yes, I loaned my car to Bullard.' And we got the approximate times and we went out and actually searched the car in the presence of the owner to see if Bullard might have left something illegal in the car while he had used it. But the search was conducted with negative results.

"Q. In other words, the statement was contradicted by this man Bullard and another marine. Is that right?

"A. Yes, sir.

"Q. And on that basis you determined that the statement of Weaver was false?

"A. Yes, sir.

"Q. Did you determine that the statement of Weaver was false in any other respect?

"A. No sir.

"Q. In other words, did you find that he had had a flat tire that day?

"A. I didn't check out the second story, because after the first one proved to be incorrect I didn't see any need of going any further.

"Q. Now Captain, you've testified with respect to certain things which Weaver said and I believe, as you put it, you 'understood him to say' that he had gone to the range in somebody else's car. Why do you say you 'understood him to say' that?

"A. Because certain of the range personnel ride on a Marine Corps bus, and—

"Q. Well what is your present recollection of what he did say? Is that your present recollection?

"A. I recall that he rode with another marine in a privately owned vehicle.

"Q. And you do recall that?

"A. Yes, sir.

"Q. Now you recall that that's what he said?

"A. Yes, sir.

"Q. And is your recollection of that as good as your recollection of other statements he made?

"A. No, sir, not about the mode of transportation.

"Q. It is not as good?

"A. No, sir, I wouldn't say it was as good.

"Q. It is not as good as his statement about having a flat tire. You remember that clearly?

"A. Yes, sir.

"Q. Do you remember clearly that he said he had loaned his car to Bullard?

"A. Yes, sir.

"Q. But you do not remember clearly that portion of the statement about another mode of transportation?

"A. I am positive he mentioned another mode of transportation. As to whether that was a military or a privately-owned vehicle, I do not recall which.

"LO: I see. Is there a question by any member of the court?

"PRES: No questions."

It may be conceded that the procedure employed by the law officer in his examination is objectionable. ▉▉▉▉ The accused had placed his veracity in issue. That could be rebutted either by testimony as to his bad reputation for that quality or by prior inconsistent statements on material issues. A false statement in regard to an immaterial part of a witness' testimony is inadmissible. Cwach v United States, 212 F2d 520, 529, 530 (CA8th Cir) (1954). Captain Laine testified that he had checked out the accused's statement to him and "found [it] to be untrue." However, he had testified to only one prior inconsistent statement. Whether there were other inconsistent statements was not clear. It was apparently this uncertainty which induced the law officer to question Captain Laine. Consequently, he had a legitimate basis for inquiry, but the form which he used was improper.[1] This isolated departure from correct procedure does not by any means show that the law officer became a partisan advocate. United States v Martin, 8 USCMA 346, 24 CMR 156. The answers of the witness contain no new information which can be considered prejudicial to the accused. Rather, they are a substantial reiteration of testimony elicited from the witness by defense counsel. Consequently, we find nothing in the law officer's examination of Captain Laine to sustain the accused's claim of partisanship or error.

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.

---

[1] Whether or not the accused made a previous inconsistent statement regarding the loan of his car to Bullard appears not to be material to the issues raised by his testimony. However, no objection was made at the trial, and the answers were not harmful to the accused. Therefore, we can pass this point.