UNITED STATES, Appellee

v

HORACE BROWN, Sergeant, U. S. Army, Appellant

13 USCMA 485, 33 CMR 17

No. 16,034

March 1, 1963

*Captain Thomas Stapleton* argued the cause for Appellant, Accused. With him on the brief were *Thomas C. Lancian, Esquire,* and *Lieutenant Colonel Ralph Herrod.*

*Captain Charles D. Reaves* argued the cause for Appellee, United States. With him on the brief were *Captain Stanley M. Wanger* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

### I

Appellant Brown, with whom we are concerned in the case at bar, is married and the father of three children. He is a sergeant and, at the time of trial, had served in the Army some nineteen years and seven months, including duty in the Aleutian Islands and in the Pacific during World War II, and subsequent service in Korea. Brown has no prior convictions and there is no evidence of trouble in civilian life before his enlistment; his record is clean.

His actions on the night in question, however, led to his trial by a general court-martial. Appellant pleaded not guilty to the separate offenses of robbery, and intentionally inflicting grievous bodily harm by shooting, in violation of Articles 122 and 128, respectively, of the Uniform Code of Military Justice, 10 USC §§ 922 and 928. He was, nevertheless, convicted of both crimes as charged, and sentenced to dishonorable discharge, for-

feiture of all pay and allowances, confinement at hard labor for five years, and reduction to the lowest enlisted grade. The convening authority approved and, thereafter, a board of review in the office of The Judge Advocate General of the Army affirmed the findings and so much of the sentence as provides for dishonorable discharge, total forfeitures, confinement at hard labor for two years, and reduction.[1]

Upon Brown's petition to this Court for grant of review, pursuant to Article 67(b)(3), Uniform Code of Military Justice, 10 USC § 867, we elected to allow his appeal in order to consider several contentions. In the interests of convenience and clarity, we shall set forth the issues in the course of our treatment of the same, *seriatim,* hereinafter.

### II

To facilitate a proper understanding of the case, and in view of the nature of the issues involved, we turn our attention to the facts. A rather ex-

---

[1] The record reveals that appellant was assigned to the retraining program, and the Secretary of the Army has taken action to suspend the unexecuted portion of appellant's sentence and to restore him to duty to complete his term of service under the current contract of enlistment, effective upon successful completion of the required period of training.

tensive review of the evidence is deemed appropriate. We shall endeavor to state the facts chronologically, in large part, and will identify the source of such testimony.

The record shows that appellant participated in a dice game in a gasthaus in Baumholder, Germany. In the course thereof he claimed to have lost about $15.00 or $20.00. Among other players in the game was one Seymore Daniels, the alleged victim in the charge of aggravated assault. He was an American civilian living in Germany, having been separated from the Army about two months prior to the night in question. Another participant was a Specialist Four Chauncey M. Lester. This man was a friend of Daniels, and was the alleged victim in the robbery charge.

Appellant Brown testified that, during his participation in the dice game, he observed the above-mentioned pair switching dice. Two other defense witnesses who were present corroborated that there was cheating going on. Appellant further asserts that when he quit the game and went into the latrine, Daniels followed him. There, Brown told Daniels that he knew what had taken place during the game, and demanded the return of his money, whereupon Daniels, using profanity, "pulled a pistol" on Brown.

A Sergeant Moore—one of the men who corroborated the fact of cheating in the dice game—testified that he and a Sergeant Mallory were also in the latrine at this time. Moore had lost $6.00 in the game and, upon his request that Daniels give it back, the latter returned $4.00. Moore also averred that Daniels was told "he better leave this place, because there was guys out there wise to him;" that he might "get hurt." When thus apprised his cheating had not gone unnoticed, the witness continued, Daniels "pulled a pistol out of his pocket, . . . cocked it, and he said, 'Nobody is going to hurt me. I can take care of myself,' or something, words to that effect." Daniels was "standing right next to" appellant when he did this.

Daniels, in his testimony, admitted

he saw Brown in the latrine and spoke with him. Further, he agreed there were one or two other men present. Daniels claimed, however, that appellant merely asked whether he was winning, or had won, to which he responded he was behind. Daniels denied he then had a pistol. He also denied cheating in the game and claimed he lost $50.00.

After leaving the latrine, appellant went on to relate, he had a drink and then left the gasthaus. Upon leaving, he encountered a friend from whom he secured a pistol for "protection," because Daniels had "pulled a pistol on me one time; I didn't know what he was going to do the next time. He could have shot me with that small pistol." Brown then walked toward the highway with the intention of obtaining a taxi and returning to camp. He waited a short interval, but no cab arrived. At that time, appellant stated, he observed Daniels, Lester, and a Sergeant Gettes get into an automobile which then proceeded toward him. As the car reached the top of an incline, near the highway and very close to where Brown was standing, it stopped. Brown approached the car on the driver's side. Daniels was driving. Appellant testified that he again requested the return of his money but was refused by Daniels with the statement "I'm not going to give you nothing." Brown insisted they had his money, but Lester and Daniels kept "stalling" him. Then, according to appellant, Daniels "taken his hand off the steering wheel and went into his side pocket again, and when he did that, I shot through his car."

Gettes testified that, when the auto stopped at the highway for oncoming traffic, Brown approached, demanding "Give me my $20.00 which you fellows took from me." The driver seemed to be stalling, and appellant said "No, I want my money now." When the driver made an attempt to pull off, according to Gettes, "that's when I saw the gun; he [Brown] held the gun, he didn't shoot it then." Appellant reasserted his demand, but Lester and Daniels "still tried to stall him off by swapping words." Gettes heard the re-

port of the first shot and prostrated himself in the back of the car. When he heard the second shot, he continued: "both men tried to jump over on top of me and I pushed both men off the best I could, and I got out the right side of the car and I ran."

Daniels' story was that, when he stopped at the top of the incline, he saw appellant and inquired whether he wanted a ride. Appellant thereupon said something he did not understand, and began firing a pistol. Daniels was hit in the leg.[2] When Brown went around to the other side of the car, Daniels opened his door and rolled out and down an embankment. There were additional shots, and shouts of "Don't shoot." Daniels also claimed "I heard Sergeant Brown say something about 'Give it up. Give it up'."

According to Lester, when the car stopped at the highway he saw Brown standing there. Lester heard a statement with reference to "going to Baumholder," then a shot rang out. He fell to the floor and saw Daniels jump from the auto. After that shot, Lester testified, appellant came around to the passenger side of the car, opened the door, fired another shot, threatened his life, and said "Give me your money." Lester thereupon reached in his pocket and gave Brown the money he had therein—some $67.00 and change.

Brown admitted that he pocketed the money handed him by Lester, although he claimed he was given only "folded money," no coins. Appellant also conceded that this was more money than he allegedly lost in the dice game. He stated, however, that his demand had been "Give me *my* money" (emphasis supplied), and he thought Lester had turned over only the amount he had lost. He testified he was unaware of the real amount or the fact that it exceeded his loss until the money was counted by criminal investigators after he was taken into custody.

### III

The defense asserts, in the first assignment of error upon which we granted review, that:

"THE QUESTIONING OF THE PRINCIPAL WITNESS FOR THE ACCUSED, SERGEANT MOORE, BY COLONEL GOODWIN, A SENIOR COURT MEMBER, SHOWED AN OBVIOUS PARTIALITY ON HIS PART TO THE PROSECUTION AND EVIDENCED AN ATTEMPT TO USE THE QUESTIONING PRIVILEGE TO HURT THE WITNESS RATHER THAN TO ASCERTAIN THE FACTS."

Sergeant Moore was the first witness called by the defense at trial. As previously noted, he testified regarding a small pistol Daniels allegedly displayed in the gasthaus latrine. Daniels, it will be remembered, had previously denied being armed. Except for Brown's mention of a "small pistol" in his pretrial statement, which had been put in evidence by the Government just prior to Moore's testimony, the latter was the first to mention Daniels' having such weapon. Understandably this matter would, then, be of interest to the triers of fact. Colonel Goodwin asked a few questions regarding the gun's nature and appearance, and Moore's recollection of the matter.

This Court has, in a number of cases, delineated the extent to which court members may permissibly go in asking questions. They may, by their inquiries, seek to clarify matters in evidence or to obtain additional information relevant to the charges. However, members of courts-martial must, at all times, keep a fair and impartial attitude. They may not, by their questions, become advocates or partisans for either side. Unbiased judgment must be maintained; excessive zeal and inquisitions cannot be countenanced. See United States v Marshall, 12 USCMA 117, 30 CMR 117; United States v Flagg, 11 USCMA 636, 29 CMR 452; United States v Weaver, 9 USCMA 13, 25 CMR 275; United States v Blankenship, 7 USCMA 328, 22 CMR 118; United States v Carver, 6 USCMA 258, 19 CMR 384.

---

[2] Indeed, it was stipulated that Daniels was hospitalized for treatment of a bullet wound he sustained in his left leg as a result of one of the shots fired by appellant.

We do not believe the questions of which complaint is made bring this case within the prohibitions indicated in our previous holdings. The first assignment of error is, therefore, overruled.

## IV

The second issue assigned by appellate defense counsel requires that we determine whether:

"THE LAW OFFICER COMMITTED PREJUDICIAL ERROR IN PRECLUDING DEFENSE COUNSEL FROM GOING INTO THE BACKGROUND OF THE PRINCIPAL GOVERNMENT WITNESS, THE CIVILIAN DANIELS."

We note at the outset, with reference to this question, that the extent of cross-examination to discredit a witness is within the discretion of the law officer. Alford v United States, 282 US 687, 75 L ed 624, 51 S Ct 218 (1931); United States v Heims, 3 USCMA 418, 12 CMR 174; United States v Hernandez, 4 USCMA 465, 16 CMR 39; United States v Hooper, 9 USCMA 637, 26 CMR 417; 3 Wharton, Criminal Evidence, 12th ed, § 872; Manual for Courts-Martial, United States, 1951, paragraph 149b.

Turning to the inquiries made by individual civilian defense counsel into Daniels' background, the record reflects the initial question was whether the witness was married. Daniels replied he was not. The second question on cross-examination was, "Do you have a girl friend?" Trial counsel interposed an objection, and the law officer informed counsel for Brown, "Unless counsel can tie this in as being material to the issues in this case, I'll sustain the objection." He required the defense "to show the materiality of this question, and as it now stands it is not material to the issues in this case."

Individual civilian defense counsel never returned to the above area, but did develop, without objection, that Daniels had not worked "physically" since his discharge from the service over three months prior to trial. The witness also, upon request, voluntarily

handed his passport to Brown's counsel and, when asked if he had permission to live in Germany, replied that he did. Thereupon Daniels was asked whether he had "a stamp by the German police to that effect" in his passport. He started to answer but was interrupted by trial counsel's objection based on materiality, which the law officer sustained. The latter stated:

"Proceed, Counsel.

"I'd like to caution counsel to keep his interrogation on cross-examination of the witness to matters which are material to this offense. I will admit that counsel has some latitude with respect to the credibility of the witness."

Individual counsel replied, "Very well," then inquired whether Daniels was being "investigated at the present time by the German police for anything." When the witness replied "Not that I know of, sir," he was asked if the German authorities then had any of his property. Once more trial counsel entered an objection, which the law officer sustained, stating:

"This issue being brought out at this time by defense counsel is not material to the issues in this case, and the responses thereto will be stricken and not considered by the court."

Aside from a subsequent question Daniels answered on recross-examination, relative to the frequency of his participation in dice and poker games, the foregoing constitutes all of the inquiries made by individual civilian defense counsel which touched on Daniels' background. It will be noted that objections were sustained to questions about a "girl friend," a police stamp in the witness' passport, and possession of property by German police. The information sought in those questions was not, of itself, of importance in determining the credibility of the witness. It is also significant that in each instance the law officer ruled on the basis of materiality; he erected no absolute bar and from the outset he invited defense counsel to make such a showing. Rather than doing so, how-

ever, counsel simply did not pursue the matter further. He diverted his attention from Daniels' background, and directed his questions to the facts of the offense. Under the circumstances, and in view of the law officer's statement as to the latitude which might be allowed on credibility, no error is shown here.

We reiterate the position announced in the authorities previously cited, that cross-examination should not be unduly hedged in and considerable latitude should be accorded counsel, but we find no abuse of discretion by the law officer in the present case. We must, therefore, reject this claim of error.

V

Another issue upon which we allowed argument inquires:

Whether the instructions on "like degree of force" and "retreat," in regard to self-defense, were correct.

As indicated in the recitation of facts hereinbefore, appellant said he had lost in a game of craps he engaged in with Daniels and Lester, among others. He contended he observed the named pair cheating. He later encountered Daniels in the latrine, informed him that he knew what had taken place in the game, and asked for the return of his money. According to Brown, Daniels responded by producing a small pistol, pointing it at him and, using profanity, stating appellant would get nothing. After such incident and the unequivocal position of Daniels as to returning any money, appellant armed himself with a loaded .45 caliber revolver, then approached Daniels and Lester in the car, again demanding his money.

He contends that he had the legal right of "recaption" of his money, and invites the attention of this Court to Section 106, Defenses of Persons, etc., Restatement of the Law of Torts, American Law Institute (1934). It provides:

"§ 106. AMOUNT OF FORCE PERMISSIBLE.

"The use of force against another for the purpose of recaption is not privileged unless the means employed are:

(a) not in excess of those which the actor reasonably believes to be necessary to effect the recaption, and

(b) *not intended or likely to cause death or serious bodily harm."* [Emphasis supplied.]

The defense claim is that appellant lost his money in a crooked dice game. But the contention concedes that possession was lost by Brown peaceably, even if as the result of cheating. We pretermit deciding the applicability of tort principles to the criminal aspect of the law that here concerns us. Likewise, we need not consider whether that rule applies to recaption of money, as distinguished from chattels, to which the Government argues the quoted provision is limited. Granting that appellant Brown had the right to demand return of his money, he had already exercised that right in the latrine. Even under the above authority, relied upon by the defense, Brown had no right to effect recaption of his money by use of a pistol. We refuse to hold that, appellant's right to return of money having been challenged by Daniels, who presented a pistol, Brown was entitled to arm himself and to renew his demand after having so enabled himself, by violence, to overcome Daniels' forcible resistance.

Of course, appellant testified that he borrowed the revolver from a "friend"[3] for "protection" after Daniels drew a pistol on him in the latrine. And he asserts he fired his weapon through the car only when he believed Daniels was again going to pull his gun. Notwithstanding, Brown himself put the lie to any right of self-defense by his testimony from the witness stand. He contends his path crossed Daniels' at the latter's auto only by chance and, not having claimed any other basis for fearing Daniels, it is thus difficult to

[3] Appellant claimed he borrowed the weapon from an individual at the gasthaus known by him to carry a pistol. He refused, however, to identify the man.

**491**

see how the revolver would be thought necessary, prior to such chance meeting, to give Brown "protection." But appellant dispels any doubt. His testimony makes clear the type "protection" he had in mind was not the sort that the law permits in self-defense. Thus, Brown admitted he had the loaded revolver in his hand when he approached Daniels' car and demanded the money.[4] According to appellant's own evidence, his demand was refused and Daniels:

". . . kept talking, he asked me was I going, and I said no. I asked what he was going to do with my money, and he kept stalling, he and Lester, and he taken his hand off the steering wheel and went into his side pocket again, and when he did that, I shot through his car."

Under Brown's own story, then—and quite without regard for whether he came across Daniels at the car by accident, or deliberately sought him out—the "protection" appellant resorted to amounted, in substance, to the following: Brown had armed himself after the original encounter. He already had his own weapon out when he approached Daniels' car; he "had the drop" on him. He demanded return of his money, and was refused and "stalled." Daniels then "asked me was I going,"[5] but Brown, not to be dissuaded, answered in the negative. After more "stalling" about the money, Daniels made what appellant interpreted as a false move. Brown then fired his pistol into the automobile.

Under those circumstances, appellant's testimony concerning his actions approaching, and at, the █ automobile makes him the aggressor, and as such not entitled to self-defense. As was pointed out in United States v Black, 12 USCMA 571, 574, 31 CMR 157, that doctrine "is limited to use of defensive force." This Court has held from the outset that the doctrine does not extend to offensive acts. United States v Ginn,

1 USCMA 453, 4 CMR 45. See also United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Acosta-Vargas, 13 USCMA 388, 32 CMR 388; United States v Straub, 12 USCMA 156, 30 CMR 156; United States v Holsey, 4 CMR 199; United States v Amdahl, 2 CMR 406; United States v Hines, 11 BR–JC 341; United States v Wright, 5 BR–JC 49; Manual for Courts-Martial, United States, 1951, paragraph 197c. And the military rule is not unique. See Laney v United States, 294 Fed 412 (CA DC Cir) (1923); Turner v United States, 272 Fed 112 (CA4th Cir) (1921); Pair v State, 33 Ala App 108, 31 So 2d 107 (1947); Gibson v State, 150 Texas Crim 401, 202 SW2d 236 (1947); Thumm v State, 24 Texas App 667, 7 SW 236 (1888). Thus, in the last-cited case it was held:

". . . to one who brings on an affray, or who prepares himself for an encounter in which he intends to wreak his malice, the plea of self-defense is not available, though his own life he imperiled in the affray. If a person, by his own wrongful act, brings about the necessity of taking the life of another to prevent being himself killed, he cannot say that such killing was in his necessary self-defense. A person cannot avail himself of a necessity which he has knowingly and willfully brought upon himself. . . . If a person voluntarily engage in a combat, knowing that it will or may result in death, or some serious bodily injury, which may produce the death of his adversary or himself, he cannot claim that he is acting in self-defense."

So, too, although the conviction was reversed on instructional grounds, the *Gibson* case, supra, reiterated the same rule in this language:

". . . One who prepares for and brings an attack upon himself may not rely upon self-defense though his own life becomes endangered during such attack, and though he actually

---

[4] In fact, interestingly enough, Brown supported his denial of intent to kill anyone in the car by the claim that, close as he was, he could easily have done so had he desired.

[5] Gettes, it will be remembered, testified that Daniels tried to drive off, but was prevented by Brown at gunpoint; that the shooting followed further argument over the money.

kills for the purpose of preventing another from killing him. It would not be in his necessary self-defense, and one can not avail himself of a necessity which he has knowingly and wilfully brought upon himself."

Of like effect is Pair v State, supra:

"In this case the defendant relied upon self defense. It is the law that in order to invoke the doctrine of self defense, the accused must be free from all fault in bringing on the difficulty, that is to say, he must not have done anything, or said anything, to provoke the difficulty.

. . . . .

". . . it affirmatively appears that under the evidence of the defendant himself, wherein it clearly appears the defendant was not free from fault in provoking the difficulty, and fought willingly, his plea of self defense, under the law was not available."

This Court follows the same rule:

". . . Having chosen to arm himself and seek a renewal of the encounter, he is in no position to maintain that he shot in self-defense." [United States v Ginn, supra, at page 458.]

Accordingly, we hold the issue of self-defense was not reasonably raised by the evidence, and the law officer, therefore, was not required to instruct the court-martial thereon. Thus the law officer's charge on self-defense was a gratuity whereby appellant received an advantage to which he was not entitled, and we need not inquire into the correctness of the instruction given. Laney v United States, supra. See also United States v Regalado, supra, and cases cited therein.

## VI

One other item merits our attention. Appellate defense counsel asserted before the board of review and, later, before this Court, that the evidence was legally insufficient to support Brown's conviction for robbery. We do not find the evidence wanting as to such guilty finding when measured against the appropriate legal standard.[6] However, we do deem it proper to examine into the issue of appellant's intent in this connection, and the adequacy of the instruction given by the law officer thereon. See Rule 4, Rules of Practice and Procedure, United States Court of Military Appeals.

This matter involves Brown's contention, to which we have adverted previously in this opinion, that he had a legal right of "recaption" of *his* money. The following quotation from 46 Am Jur, Robbery, § 12, sets forth the law on this subject generally:

"**Recovery of Money or Other Property Lost at Gambling.**—In most jurisdictions, in accordance with the view that one cannot be guilty of robbery in forcibly taking his own specific property or property to the possession of which he honestly believes himself to be entitled, the courts have declared that it is not robbery for one who has lost money at gambling to compel by force or threats the return of the money lost, although the act may be punishable as an unlawful assault or trespass. This conclusion is based either on the theory that a loser has the right to recoup his gambling losses, and consequently, a forcible retaking is without the requisite felonious intent, or that title to the money won at gambling does not pass to the winner, and therefore, the loser is merely an owner retaking his own specific property. In some jurisdictions, however, money lost at gambling is held to be the property of the winner if it has passed into his possession, and as a result, the courts regard it as robbery if the loser thereafter retakes the money by force or intimidation. The authorities are agreed that the forcible retaking of gambling losses does not constitute robbery if the money was taken by fraud under the semblance of a game. However, as in other

---

[6] Among other items, it is noted Lester's claim was that appellant demanded not "his own" money, but "your" money, and in fact that Brown forced Lester to demonstrate he had turned over *all* the money he had.

cases of an owner taking other property in addition to that which he believes to be his own, a loser is guilty of robbery in compelling the surrender of more than the amount which he lost."

The Supreme Court of California has considered this question and in People v Rosen, 11 Cal 2d 147, 78 P2d 727, 728 (1938), used the following language:

". . . This requirement of union of intent and act has led to the uniform rule in robbery cases that there can exist no felonious intent when the owner takes his own specific property from the possession of another, even though the taking is under such circumstances as would constitute robbery if the possessor were the owner thereof. People v Vice, 21 Cal 344, 345; People v Ammerman, 118 Cal 23, 50 P 15; 22 Cal Jur p 841; Johnson v State, 24 Okl Cr 326, 218 P 179; People v Hughes, 11 Utah 100, 39 P 492; State v Brill, 21 Idaho 269, 121 P 79; Triplett v Commonwealth, 122 Ky 35, 91 SW 281; Glenn v State, 49 Tex Cr R 349, 92 SW 806, 13 Ann Cas 774, 775 and cases cited in note; Temple v State, 86 Tex Cr R 219, 215 SW 965; note 135 Am St Rep, p 485. While there appears to be a conflict of authority on the question whether felonious intent is present when the defendant seeks the recaption of money lost by him at an illegal game (note, 135 Am St Rep pp 485–489), the weight of authority supports the conclusion that the intent to steal is lacking in such a case, for the law recognizes no title or right to possession in the winner. It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity. Gridley v Dorn, 57 Cal 78, 40 Am Rep 110; Bank of Orland v Harlan, 188 Cal 413, 421, 206 P 75; 16 Cal Jur p 716. In jurisdictions where such is the state of the law the weight of authority appears to favor the view that

the recaption by force or fear of money lost at illegal games is not robbery, although the act may be punishable as an unlawful assault or trespass."

The Supreme Court of Idaho stated the following in State v Price, 38 Idaho 149, 219 Pac 1049 (1923):

"The next assignment of error is based upon the following instruction to the jury:

'You are instructed, gentlemen of the jury, that if a person losing at cards voluntarily delivers the money lost to the winner's actual possession, the winner owns the money, so that the forcible taking of it from his possession may constitute robbery.'

"We think this instruction constitutes ground for reversing the judgment. . . .

"While it is held by some courts that money won in an ordinary bet and voluntarily paid over becomes the property of the winner (Blain v State, 34 Tex Cr R 448, 31 SW 368; Carroll v State, 42 Tex Cr R 30, 57 SW 99; Coker v State, 71 Tex Cr R 504, 160 SW 366), we are not prepared to indorse this doctrine. We know of no law in this state that justifies a holding that one may acquire a valid title to money or other property, either real or personal, by the simple, but unlawful, process of gambling. It has been held that, if two persons play and bet at cards, and the loser wrongfully, fraudulently, and by force and violence compels the winner to surrender to the loser the money won, this is not robbery. Gant v State, 115 Ga 205, 41 SE 698; Sikes v Commonwealth, 34 SW 902, 17 Ky Law Rep 1353; Thompson v Commonwealth, 18 SW 1022, 13 Ky Law Rep 916."

See also other cases cited in the *Price* opinion.

For a discussion of the necessity for *animus furandi* and *mens rea* in criminal cases, with an exhaustive collation of authorities see Morissette v United States, 342 US 246, 96 L ed 288, 72 S Ct 240 (1952); Barton v State, 88

Texas Crim 368, 227 SW 317, 13 ALR 147 (1921).

In this country the general rule seems to be that title to money lost in a gambling game does not ▆▆▆▆ pass to the winner but remains in the one losing the same. In Texas the contrary is held to be true, but then only in the event the money is won in accordance with the rules of the game. Blain v State, 34 Texas Crim 448, 31 SW 368 (1895); Fisher v State, 102 Texas Crim 229, 277 SW 386 (1925); Cole v State, 104 Texas Crim 533, 286 SW 204 (1926). Thus, even in Texas it is held that title to money, which is won in a gambling game as the result of cheating, does not pass, and the reception thereof does not constitute robbery. Punchard v State, 91 Texas Crim 603, 240 SW 939 (1922); Fisher v State, supra; Murphy v State, 133 Texas Crim 189, 109 SW2d 488 (1937).

In any event, it is plain that, under military law, one does not steal when he effects the reception of ▆▆▆▆ money he has lost in a crooked gambling game. United States v Dosal-Maldonado, 12 USCMA 442, 31 CMR 28. This is so because his taking is by claim of right under the *bona fide* belief he is the owner. For that reason, one who takes property forcibly under those circumstances may be guilty of assault,[7] but is not guilty of robbery. United States v Kachougian, 7 USCMA 150, 21 CMR 276. See also United States v Walter, 8 USCMA 50, 23 CMR 274; United States v Lenton, 8 USCMA 690, 25 CMR 194; United States v Young, 8 USCMA 695, 25 CMR 199. Reference to the above cases makes it apparent this Court has adopted the rule of People v Rosen, supra, and allied cases.

All witnesses, Government and defense, agree that the transactions involved in this case had their origin in a crap game. There is conflict as to whether the alleged injured parties had engaged in cheating and there is a lack of evidence as to which participants in the game were winners. However, one

---

[7] See United States v Calhoun, 5 USCMA 428, 18 CMR 52.

witness, Sergeant Moore, testified that he was successful in "recaptioning" from Daniels some of the money he had lost in this same game—albeit he was successful in so doing without employing any force. In any event, the entire case of appellant Brown was based upon the recovery of money lost in a gambling game in which he asserted there was cheating by the pair he is alleged to have victimized in the two offenses at bar.

The law officer, in his instructions to the court-martial, limited the appellant's defense as to the alleged robbery to the following affirmative language:

"In connection with this specification, the court is further instructed that if the defendant, Sergeant Brown, took, at the time and place indicated in the charge sheet, money from Lester which he bona fidely believed to be his own property, then such taking cannot be the larceny necessary in a crime of robbery."

Previously, in an out-of-court hearing on instructions, defense counsel requested the following instruction:

". . . 'If defendant, Sergeant Brown, at the time and place indicated on the charge sheet, took money from Lester and/or Daniels which he believed he lost to them in a gambling game, then such taking cannot be the larceny necessary in the crime of robbery.' "

Without additional instructions as to title to property lost in a gambling game and the loser's right ▆▆▆▆ to reception, as noted above, the court-martial was without proper guideposts by which to render its decision. If it believed or had a reasonable doubt as to appellant's contention that he lacked the requisite felonious intent —a necessary element of the crime of robbery—then the court-martial should not have found him guilty of that offense.

We are not unmindful of the fact that Brown may have been found guilty of robbery in compelling the surrender of more than the amount which he lost. 46 Am Jur, Robbery, § 12, supra; Unit-

**495**

ed States v Dosal-Maldonado, supra. See also, in this connection, and with reference to intent at time of assault and of taking, Alaniz v State, 147 Texas Crim 1, 177 SW2d 965 (1944); Bass v State, 151 Texas Crim 172, 206 SW2d 599 (1947). However, it must be remembered that appellant contended he only asked for "my money," believed that was all he obtained, and was not aware of how much he received until it was counted by criminal investigators. Clearly this raised an issue of fact which should have been submitted to the court-martial for its decision along with proper instructions to acquit appellant of robbery if he was engaged in the recaption of money lost in a gambling game.

". . . It is, of course, familiar law that 'to single out and declare the effect of certain facts without consideration of other modifying facts' will constitute prejudicial error."

Meadows v United States, 82 F2d 881, 884 (CA DC Cir) (1936). See also Weddel v United States, 213 Fed 208 (CA8th Cir) (1914); Urban v United States, 46 F2d 291 (CA10th Cir) (1931); Perovich v United States, 205 US 86, 51 L ed 722, 27 S Ct 456.

While it is true that individual civilian defense counsel acceded to the law officer's modification of the requested instruction, we cannot ignore that the latter took the position the instruction was improper in the form submitted. Certainly, under the circumstances, we do not find an intentional and deliberate waiver by the defense. United States v Beer, 6 USCMA 180, 19 CMR 306. To the contrary, the essence of defense counsel's position—from the outset and throughout—was that robbery would not lie if appellant merely recaptioned his gambling losses from those who cheated him.

The finding of guilty of robbery under Charge I, therefore, must be and is set aside. The decision of the board of review is reversed and the record is returned to The Judge Advocate General of the Army for submission to a board of review. The board may approve a finding of lesser offense of assault with a dangerous weapon against Lester, together with the valid conviction for intentionally inflicting grievous bodily harm on Daniels, under the other specification, and reassess the punishment; or, a rehearing may be ordered on the robbery specification and the sentence for both offenses.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

Except for the conclusion that the right of recaption was not presented to the court-martial, I am in agreement with the principal opinion. As to recaption, I disagree with the conclusion that the matter was not presented to the court-martial. The law officer reviewed the original instruction requested by defense counsel and noted that the defense reference to money lost in gambling did not "tend to denote ownership on his part." He asked individual defense counsel to rephrase the request to make that part clear. Counsel did so, and the law officer gave the instruction in the reframed form. There is no reasonable risk that the court members did not know that the property referred to in the rephrased instruction was that purportedly lost by the accused in the allegedly crooked crap game. In these circumstances, I see no basis whatever for any complaint that the instruction does not cover the specific issue the accused wanted to raise. See United States v Parker, 8 USCMA 704, 706, 25 CMR 208. I would affirm the decision of the board of review.