UNITED STATES, Appellee

v

CLARENCE E. DUCKWORTH, Technical Sergeant,
U. S. Air Force, Appellant

13 USCMA 515, 33 CMR 47

No. 16,324

March 8, 1963

*Lieutenant Colonel Wallace N. Clark* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph E. Krysakowski.*

*Major Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis* and *Lieutenant Colonel John C. Wiley.*

## Opinion of the Court

KILDAY, Judge:

Accused was tried by a special court-martial at McChord Air Force Base, Washington. Despite his plea of not guilty he was convicted of assault on Staff Sergeant Verratti by striking him in the face with a piece of broken glass, a means likely to produce grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC. § 928. He was sentenced to be discharged from the service with a bad-conduct discharge. The sentence was approved by the convening authority and the officer exercising general court-martial jurisdiction. A board of review in the office of The Judge Advocate General of the Air Force affirmed the findings and sentence.

This court granted review on the following assignment, to determine whether:

"THE INSTRUCTIONS OF THE PRESIDENT ON THE LAW OF SELF-DEFENSE WERE GROSSLY INADEQUATE AND PATENTLY MISLEADING IN THE PREMISES."

Staff Sergeants Verratti and Johnson were in the Noncommissioned Officers' Club at McChord Air Force Base. While there, they met a young lady and the three sat together at a table. After

a short while the two sergeants went to the latrine, leaving the young lady at the table. While they were gone the appellant approached the young lady and engaged her in conversation. He asked her to dance, but the invitation was declined. As the two sergeants returned from the latrine they saw appellant leaving the table where the young lady was sitting and return to the bar. As the sergeants passed appellant, Sergeant Verratti, the injured party, said something to appellant to the effect that he should talk to the young lady only when they were present. A "discussion" or "argument" ensued, during which Sergeant Johnson was pushed by appellant. Sergeant Verratti claimed that he then started to leave and return to his table. As he was halfway turned around, Sergeant Verratti claimed he was suddenly pushed on the shoulder which turned him back to the direction of the appellant and then was struck on the left side of the face near the left eye with something sharp. Verratti was unable to state, specifically, that he saw the appellant deal the blow but did state that accused was the only one immediately in front of him. The victim admitted that after he had been struck he started to swing at the appellant in order to protect himself. Sergeant Johnson claimed he heard glass being broken and returned to the immediate area after he saw that Verratti had been struck, and seized appellant. Both Verratti and Johnson denied having any weapons other than their fists, and they denied having used any provoking language or inviting the appellant to engage in any sort of fight.

A waiter working in the club described the incident as an argument which attracted his attention. He heard Verratti make a remark to the effect, "Well, let's get with it," and then backed up a bit. The waiter testified that almost immediately he heard the sound of breaking glass, turned, and saw the appellant strike with his right hand towards the left side of Verratti's face. He stated that the fight was then broken up by the crowd and he then noticed blood all over Verratti's face.

The young lady companion testified that her attention was attracted by loud voices and she saw the appellant with a glass or bottle in his hand; she denied seeing the actual striking but stated that she saw appellant strike at Verratti with the glass object in his hand.

The appellant testified in his own behalf. Details of his testimony will be given later herein. The defense also offered a witness who had been at the bar. He added nothing to the facts of the encounter, and was apparently offered by defense as a technique of showing that the prosecution had not produced all of the witnesses.

The evidence indicated that an individual was present at the end of the bar in close proximity to the incident. He had not been produced. After the prosecution rested, defense counsel moved that the court find the appellant not guilty. After extended argument the motion was overruled. Thereupon defense counsel made an opening statement to the court and therein stated that its case would in part consist of showing there was a witness to the beginning of the incident but, due to inadvertence or some other cause, the witness was unobtainable; that he was unavailable to the defense because they did not know his identity; that his name was not gotten but, as a matter of fact, a person in charge of the club that night talked to the absent witness. Through a defense witness, defense counsel sought to establish the presence of an unproduced witness. While he did not succeed in doing so, he did establish the probability of the presence of such absent witness.

When the defense rested, the president of the court announced there would be a recess over the week-end; and stated the court would like to know what effort was made to locate the unidentified witness. In that connection he stated:

"Evidence has been offered already establishing there was a witness and the court would like to know if an effort was made to obtain this witness, or if an effort can be made over the weekend. We are very much desirous of the appearance of this witness."

Discussion ensued as to efforts to secure the identity of the witness and the possibility of a stipulation was then discussed.

When the court convened on Monday, the prosecution moved to reopen its case. The motion was granted without objection by defense counsel. Thereupon trial counsel, by a witness, identified the absent witness as named "Hatfield" and his rank as Technical Sergeant. Trial counsel then called Technical Sergeant Norman R. Hatfield, who stated that he was present in the NCO Club at the time of this incident and proceeded to testify as follows:

"I turned back to the bar. In about thirty seconds or a minute or so, he [appellant] reached across in front of me and took the drink and busted the glass and turned around and stood between them. I don't know whether the one guy hit at him or not. He brought the glass up by the side of his head, on the left side of his head.

"TC: Did you see this blow struck?
"A. Yes, sir.

"Q. Would you then demonstrate to the court in the manner in which it was made—the motion?
"A. Well, from where he was standing it looked like he took about one step across in front of me and back up and took one step between the two people he was talking to.

"Q. I mean the blow itself. Will you motion with your arm how the blow was delivered?
"A. He brought it up with his right hand across the side of his left face—left side of his face.

"Q. How was the glass broken?
"A. He broke the top off the glass, he had ahold of it by the bottom.

"Q. Where did he strike it?
"A. Along the side of the bar.

"Q. Whose drink was this, whose glass was this, do you know?
"A. It was mine.

"Q. Now, you said something a moment ago, that you didn't know whether the other fellow hit at the accused. What time in relation to the blow by the accused with the glass are you talking about? Before or after?
"A. I don't believe I understand you.

"Q. You said a minute ago that you don't know whether the fellow that got cut struck at this man who took your glass. Is that correct?
"A. Yes, sir.

"Q. Are you referring to the time before your glass was broken or afterwards?
"A. Well, he didn't make any move to hit him before the glass was broken but it's possible that he could have when he busted the glass because he was standing a little bit on the other side of where I was standing, partially obscured."

We have included Sergeant Hatfield's testimony out of the order of its production to the court-martial in order that the testimony of the prosecution might appear together in this opinion. As earlier noted, the appellant testified in his own behalf prior to the testimony of Hatfield. Because of the disposition we make of this case, we include all of appellant's testimony with reference to the actual conflict:

". . . As I was turning Sgt. Verratti grabbed my arm and I believe his exact words were, 'Turn around and face us when we're talking to you'. I didn't, I kept turning and during the process of the turn, I was quartering to the bar or about in that position, at any rate I could see the bar and there was no one behind the bar, I was struck, I was hit in the back of the head or the side of the head. As I came off the bar, the man on my left would be Sgt. Johnson, there was something in his hand at that time I believed it to be a glass or whatever it was it reflected a light. The lighting was behind me, it was dark behind him. We wrestled, at any rate I grabbed the man's hand, we wrestled with the hand and during the course of it I felt pain in my hand. As I was wrestling with his hand I was struck again and dove into the bar for the

518

second time. The last time that I came up from the bar, the last thing that I can remember was that there was flowing into my eyes, liquid in my eyes. I thought it was blood. The next thing I knew there was some shuffling, the next thing I can remember for sure was Sgt. Craig had me by the arm and said, 'Duckworth, this is Craig, go to the latrine'. Now, it seems to me—it seems to me that the second time I hit this bar that as I came off—up, I swung. To the best of my knowledge I had nothing in my hand. . . .

. . . . .

"Q. Did you at any time during this incident hit Verratti?

"A. I do not know, sir.

"Q. Didn't you testify on direct examination, words to the effect 'the second time, I hit him'? Don't you remember that?

"A. I testified that after I came up from the bar the second time I think that I swung.

"Q. Do you deny hitting him?

"A. Do I deny, or could I deny?

"Q. Do you deny hitting Verratti?

"A. No, sir.

"Q. Do you deny breaking a glass or bottle?

"A. Deliberately or accidentally?

"Q. Either one?

"A. I deny breaking one deliberately for the purpose of using it.

"Q. Do you deny breaking one you had in your hand?

"A. I had no glass in my hand.

"Q. Do you deny picking one up then?

"A. Yes.

. . . . .

"Q. Now, you say you saw something in Johnson's hand?

"A. That's right.

"Q. And you grabbed at the hand?

"A. That's right.

"Q. That's how you ascribe your injury? That's how you figure your hand got cut?

"A. That's the way I figure my hand got cut.

. . . . .

"TC: Now, Verratti got hurt in this matter, you know that now, don't you?

"A. Yes, sir.

"Q. And yet you say the glass was in Johnson's hand?

"A. What I believe to be the glass, yes.

"Q. All right, what you believe to be the man that had the glass; you wrestled with the man that had the glass. How did Verratti get hurt?

"A. I haven't the slightest idea.

. . . . .

"Q. In sum then, sergeant, you don't deny hitting Verratti, is that correct?

"A. I have no recollection of hitting Verratti.

"Q. But you can't deny it if you don't remember?

"A. No, sir, I can't deny it.

"Q. And I believe you don't deny breaking a glass.

"A. I do deny breaking a glass.

"Q. You remember you did not break a glass?

"A. I am sure that if I had broken a glass, I'm sure I would remember it.

"Q. How are you so sure of that?

"A. I am just sure that I would and the reason that I don't deny hitting Verratti is that I feel, I believe that at one time I swung.

"Q. You wouldn't remember hitting a man, that wouldn't have enough significance for you to remember?

"A. I don't know if I made a contact with him or not.

"Q. You wouldn't feel it?

"A. Can you remember every blow that you received?"

It is clear from this record that the prosecution theory, as developed by its testimony, was that appellant made an assault upon Verratti by striking him with a broken glass, a means likely to produce grievous bodily harm. If the court should believe the prosecution testimony, beyond a reasonable doubt, the appellant is guilty of aggravated

assault. On the other hand, the appellant urged that, although assaulted, he made no assault; that he had no glass and did not attempt to use a broken glass during the difficulty. Unless the court rejected appellant's contention, he is guilty of no offense.

In a trial in any court, issues to be determined by the triers of fact must be made by evidence produced at the trial. A plea of self-defense is in the nature of a plea in confession and avoidance. The defensive theory, as developed by all, or any, of the evidence, must be in the nature of the admission of an assault and an avoidance of guilt because of the excuse—or in some jurisdictions, the justification—that such assault was in his own necessary defense.

An issue not raised reasonably by the evidence need not be submitted to the triers of fact, and specifically as to the issue of self-defense, we cite Warren on Homicide, Perm ed, § 338 at page 281:

". . . Instructions relating to the doctrine of self-defense are improper, when unsupported by the claim or evidence of the defendant or the state. Thus, where according to the state's theory and evidence, defendant is guilty of murder, and the defense relied on is that defendant did not kill the deceased or participate in the homicide, an instruction as to self-defense is properly omitted."

Such has been the holding of this Court. In United States v Wilson, 5 USCMA 783, 786, 19 CMR 79, we said:

"The evidence must show 'a sound theory of self-defense' in order to warrant an appropriate instruction. United States v Ginn, 1 USCMA 453, 457, 4 CMR 45. No such theory appears here. The accused did not contend that it seemed reasonable to him to use a knife in defense of his person. Rather, he strenuously disputed the fact that it was he who inflicted the injuries on Pierce. In his own testimony, he categorically denied that he carried a knife, or that he used one in the course of the fight. He produced witnesses to testify that they saw the fight, but that they did not see him with a knife. He presented evidence tending to show that after the fight Pierce appeared to be unharmed. Finally, his counsel forcefully argued that the evidence did not preclude other 'possibilities of this wound being inflicted on Pearce [sic].'

"Indisputably, therefore, self-defense was not raised by the evidence and it was not relied upon by the accused. On the contrary, he disclaimed all responsibility for the injuries to Pierce. This disclaimer is just the opposite of the contention advanced in a plea of self-defense. Under such a plea the accused admits inflicting the injury, but contends that he did so because it was necessary to protect himself from injury. On the evidence, therefore, there was no need of any instruction on self-defense. Consequently, the inadequacies of the instruction here did not prejudice the accused."

Other courts are, and long have been, in agreement. We cite the following from Hooper v State, 29 Texas App 614, 16 SW 655 (1891):

"It is contended that the issue of self-defense should have been submitted to the jury. We do not so understand the facts of this case. The state's theory was assault to murder. The defendant's contention was that he made no assault at all, that he had no pistol, and did not attempt to use a pistol during the entire difficulty. To these facts defendant testified in person. This is his view of the case."

In Kidwell v State, 35 Texas Crim 264, 33 SW 342 (1895), it was stated:

"The appellant also asked a charge on self-defense, based on the right of appellant to interfere in the conflict between deceased and Lay. We have examined the record carefully, and fail to find anywhere evidence upon which the theory of self-defense can be predicated in this case. If we look at the testimony of the state,

520

the case was at least murder. If we look at the testimony of the appellant, he is guilty of no offense, as he had nothing whatever to do with the homicide; and the court gave him a pertinent and lucid charge on that theory, and appellant makes no complaint as to same."

So, too, Toliver v State, 104 Ky 760, 47 SW 1082 (1898), held:

"He [appellant] denied that he did the shooting which resulted in the death of Gross, and so testified. The testimony for the commonwealth tends to show that while the deceased was working in his cornfield the accused shot him in the back. There is no pretense or claim that the shooting was done in self-defense; neither was the slightest evidence offered, or a circumstance proven, to indicate that such was the case. The court did not give, and should not have given, an instruction on the law of self-defense. It instructed the jury on the subjects of murder and reasonable doubt, which were all the instructions that should have been given."

Nothing in the evidence of the prosecution in this case suggests the presence of self-defense. We ▆▆▆▆▆■ have quoted extensively from the testimony of the appellant. From it, it is clear that appellant contended he did not have a glass, did not break a glass and did not strike Varratti with a glass. Rather, he stated Sergeant Johnson, and not he, had what appeared to be a glass which appellant sought to take from him and thus accounted for the cut on his own right hand. True he said that he might have swung, but did not recall having made contact. This is far from a claim that he acted in self-defense. Actually, that single statement when taken in context means nothing insofar as the encounter is concerned. Appellant contended he was assaulted by Verratti and Johnson and was injured by one or both of them. However, he contended he did not defend himself, other than a possible swing, presumably involuntary or by some sort of reflex action.

Rather than a plea in confession and avoidance, the appellant relied upon the general issue that he was not guilty. The full and complete instruction on reasonable doubt presented the appellant's theory of the case to the court-martial.

We have often held that where the evidence fails to reasonably raise an issue, a defective instruction on that issue presents no question of prejudice to the accused, for he is the recipient of a gratuity. United States v Wilson, supra; United States v Brown, 13 USCMA 485, 33 CMR 17; United States v Regalado, 13 USCMA 480, 33 CMR 12. See also United States v Rodriguez-Suarez, 4 USCMA 679, 16 CMR 253; United States v Gurevich, 7 USCMA 203, 21 CMR 329; United States v Mingo, 8 USCMA 164, 23 CMR 388. And see Galloway v United States, 235 F2d 515 (CA DC Cir) (1956); United States v Bateman, 8 USCMA 88, 23 CMR 312.

We commend law officers and presidents of special courts-martial for submitting the issue of self-defense when any doubt might exist as to the presence of that defense. We issue a caveat also, however, that an incorrect ▆▆▆▆▆■ instruction on self-defense, even though not raised by the evidence, or a correct instruction on self-defense, when the issue is not reasonably raised, could in some circumstances result in prejudice to the accused. Mattison v State, 54 Texas Crim 514, 114 SW 824 (1908). As we have heretofore stated, very careful consideration must be given to the facts of the particular case in the inclusion of such instructions and the content thereof. United States v Smith, 13 USCMA 471, 33 CMR 3.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.