UNITED STATES, Appellee

v

HENRY A. GREEN, Private, U. S. Army, Appellant

13 USCMA 545, 33 CMR 77

No. 16,317

March 22, 1963

*Lieutenant Colonel Ralph Herrod, Captain David M. Gill,* and *First Lieutenant John G. Milano* were on the brief for Appellant, Accused.

*Lieutenant Colonel Francis M. Cooper* was on the brief for Appellee, United States.

## Opinion of the Court

KILDAY, Judge:

Charged with premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918, accused was tried by a general court-martial convened at Fort Bragg, North Carolina. He was convicted of the lesser offense of involuntary manslaughter, a violation of Article 119 of the Code, 10 USC § 919, and the court sen-

546

tenced him to dishonorable discharge, total forfeitures, confinement at hard labor for three years, and reduction. Thereafter, the convening authority and a board of review in the office of The Judge Advocate General of the Army affirmed. We granted review on the following issue:

> Whether the self-defense instructions are correct in regard to "retreat," and in stating that the force in self-defense "should approximate" that offered, that there should be a "rough balance. . . . some degree of equality" between the two.

Some background concerning this tragedy is appropriate to our inquiry. The accused, who was not yet nineteen years of age at the time of the instant offense, had enlisted in the Army a year and a half earlier. He was five feet, eleven inches tall, and weighed one hundred and sixty-five pounds. Less than six months prior to the date of this killing, accused had borrowed a large sum of money. The total loan, with interest, amounted to some $1,090.00, with which he purchased a used auto, made repairs thereon, and paid for insurance and license fees.

The victim, one Specialist Four Willie Gray, was an older, larger and stronger man—twenty-seven years of age, approximately six feet, four inches in height, and weighing some two hundred and thirty pounds. Despite this difference in age, size, and experience—or perhaps because of it— accused and Gray had been "buddies." The former let the victim take his newly acquired auto on several occasions.

The evidence indicates Gray abused this privilege, as damage to the auto occurred on certain instances when he borrowed accused's car. In fact, on the last occasion it became disabled; Gray abandoned it; and it was subsequently stripped by vandals. The cost of necessary repairs apparently made it economically infeasible to fix the auto, and a serious dispute arose between accused and Gray concerning responsibility for the loss. At first, accused claimed, Gray refused to pay anything but, after a good deal of "haggling," finally agreed to make some compensation and gave accused $5.00 in partial payment.

After payday the next month, accused asked Gray for more money, telling him that, contingent on such further payment, he would sign over the title to the car. Accused testified Gray refused to pay any more money. Rather, he demanded return of his $5.00, which accused averred he tendered to Gray.

Apparently accused was greatly angered. He admitted, and witnesses overhead him call Gray an obscene name. The witnesses claimed Gray told accused "not to say it again," but accused repeated the obscenity. It is undisputed that Gray thereupon slapped accused. It was a hard blow, but did not knock accused down and he left. It is clear from the record, and accused admits, that he went to the post exchange and purchased a large hunting knife, some ten and one-half inches long. Thus armed, accused returned to the company area. Only ten or fifteen minutes had elapsed. He found Gray in the arms room. There, according to accused, Gray attacked him and, in the course of the ensuing fight, Gray was cut with the knife. Accused ran from the room, dropping the knife as he fled, but was apprehended outside. Gray was hospitalized. His left femoral artery and vein had been severed and, despite emergency treatment and transfusion of some fifty-six units of blood, he died as a result of a stab wound in the groin area.

Having sketched that general backdrop, we turn our attention to the instructions given by the law officer on self-defense. As indicated earlier, appellate defense counsel challenge the advice insofar as it relates to both retreat and quantum of force. As to the latter aspect, our recent decisions in United States v Acosta-Vargas, 13 USCMA 388, 32 CMR 388; United States v Smith, 13 USCMA 471, 33 CMR 3; and United States v Hayden, 13 USCMA 497, 33 CMR 29, are controlling. See also United States v Straub, 12 USCMA 156, 30 CMR 156; United States v Black, 12 USCMA 571, 31 CMR 157.

The law officer's instructions as to force do indeed contain the words set forth in the granted issue. It is apparent, however, that he extracted the language from this Court's opinion in *Straub*, supra, in a commendable effort to avoid any reference to "like degree of force." Moreover, it is clear from the law officer's instructions as a whole that he adequately explained the principle to the court-martial members. Thus, he had previously—and quite properly—charged that one was entitled to kill in self-defense if he believed, upon reasonable grounds, such action necessary to protect against the imminent danger of death or grievous bodily harm to himself. He added that self-defense was not available to an aggressor, then continued:

"The court is further advised that in the case of an assault the extent of the force that may lawfully be used in the defense of the person must be governed by the violence and the nature of the act of the alleged assailant. If a person uses more force in the defense of his person than the law allows, he becomes the aggressor. The theory of self defense, gentlemen, is protection and not aggression, and to keep the two in rough balance, the force to repel should approximate the force and the violence threatened. Of course, no one can reasonably expect detached reflection under conditions of stress or in a fast moving situation, but some degree of equality between the offensive and defensive forces is required."

Further, the law officer advised that, in considering whether accused resorted to excessive force, the court should:

". . . take into account the evidence that you have heard as to the previous relationship between Gray and Green, the circumstances preceding, leading up to and surrounding the event in question, the relative physical proportions of Gray and Green and you may also take into account the psychiatric testimony that has been received, as well as all the other evidence in the case."

The instructions in that regard, therefore, are not deficient. United States v Acosta-Vargas, supra.[1]

The other aspect of the issue before us concerns the law officer's instruction that:

". . . No necessity [to act in self-defense] will be considered to exist until the person, if not at his place of abode, which may include a barracks or the place where he sleep [sic] and keeps his possessions, or at a place where he has a duty to remain, has retreated as far as he safely can."

There can be no question but that the law officer was mistaken insofar as he imposed an absolute requirement of retreat. The opportunity to do so in safety is but one factor to be considered with all others bearing on the issue of self-defense. See United States v Smith, supra; United States v Hayden, supra; and cases therein cited.

We do not find reversible error in the case at bar, however, for examination of the evidence demonstrates accused's acts were not within the pale of self-defense. Thus, the law officer's instruction thereon was a gratuity, proffered out of an abundance of caution, but not prejudicial to accused's substantial rights. United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Brown, 13 USCMA 485, 33 CMR 17; and authorities there collated.

The circumstances of this killing were recounted in general terms at the outset, and elaboration on certain of the facts will suffice to make this point clear. A witness to the stabbing, who was present with Gray in the arms room, testified accused had entered and

[1] Additionally, we note in passing the defense perceived no deficiency at trial. The law officer had, in an out-of-court hearing, given the defense a preview of the instant instruction as to approximation, balance, and equality of force, which he proposed to give. Defense counsel at that time, and again in open court, indicated his satisfaction with the advice. See United States v Johnson, 3 USCMA 447, 454, 13 CMR 3.

walked up to his victim without a word. When accused was about a foot away he drew back his hand. The witness claimed he saw the knife and cried out a warning to Gray; that the latter was stabbed in the struggle that ensued. Neither the testimony of this witness nor other evidence offered by the Government raises the issue of self-defense.

Accused's version of the incident differed, but fails to raise that issue to exculpate him. He claimed he was angry about the auto before and, when Gray slapped him, he became more so—as angry, in fact, as he had ever been. He left Gray and ran to the barracks, looking for some sort of weapon—a stick, broom, or something else "to pick up." He admitted he came across a close friend to whom he complained of Gray's actions and who he asked for a knife.[2] Meeting with negative results accused proceeded to the post exchange, where he thought he might find a weapon, for he remembered seeing a hunting knife there. He purchased the weapon with which the fatal stab was later inflicted, immediately returned to his unit, and sought out Gray. Accused denied he went to the arms room to kill or hurt Gray. Rather, accused said he merely "wanted to talk to him because I didn't want him pushing me around."

According to accused, when he entered the arms room he saw that Gray had a carbine in his hands. "[J]ust as I walked in," accused continued, the other man present "yelled, 'Get him, Gray.'" Gray had put down the gun and "was making it towards me and I reached for the knife and he hit me. He hit me twice before I even tried to keep him back off of me."

Significantly, no claim is made Gray made any use whatever of the carbine.[3] And, despite Gray's size and strength, accused admitted under oath that, except for the slap, Gray had never done anything to make him afraid. Nevertheless, accused claimed "protection" was his purpose in arming himself with the hunting knife, "just in case he got after me." While accused claimed he was not looking for a fight, he needed the knife because he "didn't have any idea that I could beat the guy, I didn't want to bother him. I didn't want to do anything to him. All I wanted to do was get straight on my car." Accused "didn't know [whether] he would bother me or not"; he thought Gray wouldn't "come up on me" against a drawn knife, that "everybody should be afraid of a weapon."[4] The knife was only to frighten Gray, and accused contended the victim was stabbed accidentally in the course of their struggle.

Accused denied any intent to kill or seriously injure Gray, and the court-martial returned findings consistent with this contention. Nonetheless, and accepting accused's testimony at face value, it is apparent that, after Gray had humiliated and angered him, he deliberately armed himself with a large, wicked hunting knife; then immediately sought out Gray and renewed the encounter. He clearly evinced—both by his actions at the time and his testimony at trial—his insistence on procuring an "equalizer," then getting some settlement from Gray on his automobile. Moreover, accused's own evidence demonstrates his awareness that renewing the encounter with Gray might lead to difficulty. Accused did not indicate that, upon reasonable grounds, he feared imminent death or serious injury at Gray's hands and for that reason armed himself. To the contrary, and knowing further confrontation with Gray might spark problems of lesser genre, accused's whole conduct bespeaks he deliberately procured the knife because of his oft-repeated statement, "I didn't have any idea that I could beat the guy."

---

[2] This friend sometimes carried a TL–20 Government-issue knife. Accused had told him of what Gray had done. He testified that accused was extremely upset and had "asked me if I had a knife or anything on me."

[3] As previously noted, Gray immediately put the firearm down and, for aught that appears, it was in his hands by happenstance when accused entered, which would hardly be surprising since this incident occurred in the unit arms room.

[4] See United States v Berry, 6 USCMA 638, 20 CMR 354.

From our recent holdings in United States v Regalado, supra; United States v Brown, supra; United States v Campbell, 13 USCMA 531, 33 CMR 63; and United States v Duckworth, 13 USCMA 515, 33 CMR 47; and authorities upon which we relied in these cases, there can be no question that aggressors, those who engage in mutual combat, or any who thus precipitate an altercation, are not entitled to self-defense. Clearly the accused's actions in the case at bar bring him within the sweep of that rule. While we are not unsympathetic to a young man thus put upon—as apparently accused was in this instance—by an older and unscrupulous "friend," we cannot sanction self-help of the sort here exercised by accused. To do so would make a mockery of Government under law and encourage like tragedies. In light of all the circumstances here involved, and for aught Gray did and however reprehensible his conduct, the law does not permit accused—under the guise of action in self-defense—to arm himself with a dangerous weapon; deliberately seek out his "antagonist" and renew the encounter; and provoke an altercation with the foreseeable consequences that here ensued.

We hold no issue of self-defense was reasonably raised by the evidence. Accordingly, the law officer did not commit prejudicial error. Cf. United States v Weems, 3 USCMA 469, 13 CMR 25; and see United States v Jones, 7 USCMA 623, 23 CMR 87.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

I respectfully disagree with my brothers. In my opinion, there is in this record some evidence of action by the accused in self-defense. The contrary view disregards our holding in United States v Black, 12 USCMA 571, 31 CMR 157, and, in fact, if not in law, brings the Court back full circle to the position which was originally espoused in United States v Straub, 12 USCMA

156, 30 CMR 156, through the device—so oft-condemned—of disregarding the import of the accused's testimony and a consequent refusal to distinguish between arming one's self for protection against another's attack and obtaining a weapon to use as an aggressor. Warren on Homicide, Perm ed, § 151; State v Short, 120 La 187, 45 So 98 (1901); Shannon v State, 35 Texas Crim App 2, 28 SW 687 (1894). I call attention once more to our inability so to find facts at this level, for, as a judge of the law:

> "I cannot tell how the truth may be; I say the tale as 'twas said to me."[1]

As set forth in the principal opinion, accused, then an eighteen-year-old youth of excellent character and known as a peaceable individual, engaged in a verbal altercation with a fellow soldier, Willie Gray, over the latter's responsibility for accused's automobile. Gray was approximately six feet, four inches tall and weighed about two hundred and thirty pounds. Accused was approximately five feet, eleven inches tall and weighed about one hundred and sixty-five pounds.

On March 1, 1962, the disagreement between Gray and Green came to a head and culminated in Green's use of an epithet toward Gray and the latter's retaliation with a hard slap.

It is also true that Green left the scene and met a close friend, Waters, whose knife he sought to borrow. Waters testified, however, that accused also stated why he wanted the weapon:

> "A. Sir, he said he wanted a knife or something, *he said he wanted to go back and talk to Gray about his car. That's what he told me. He said he wanted to go back and try to talk to him. That's the words he said.*
>
> "Q. *Did he say anything about, 'that's all I want to do is talk to him'?*
> "A. *That's what he said, sir.*"
> [Emphasis supplied.]

Further, the evidence establishes that accused proceeded to the post exchange,

[1] Scott, "The Lay of the Last Minstrel."

purchased a hunting knife and went to the arms room in which the deceased worked. When he was observed entering the barracks, no weapon was visible, although witnesses noticed a bulge under his sweater. Thereafter, according to the prosecution's evidence, Green rushed into the arms room, brandishing the knife, and immediately launched an attack upon Gray with the fatal result which led to his trial.

Leaving Gray on the floor of the room, Green ran out, pursued by other soldiers. He tossed his weapon to the ground near the barracks but, when apprehended, still had its sheath in his rear pocket.

Accused elected to testify in his own behalf. After relating his version of the argument which ended with Gray slapping him, Green declared that he unsuccessfully looked for a broom to protect himself against Gray. He met Waters and asked the loan of his knife. Waters replied that "he didn't have one, and for me to calm down." Accused told him not to " 'get too worried over it; I was not going to bother him, but I was going to talk to him [Gray] about the money.' "

Accused went to the post exchange and purchased a knife. As he went back to the company area, he placed the knife and its scabbard on the inside of his pants under his sweater. He entered the barracks and went to the arms room. He described his reception as follows:

". . . [J]ust as I walked in, Lockett yelled, 'Get him, Gray,' and I glanced back at Gray and he was making it towards me and I reached for the knife and he hit me. He hit me twice before I even tried to keep him back off of me.

. . . . .

"After he hit me, I had the knife back like this and he tried to grab my hands, sir, and he had his left hand straight out close up on me and I kept brining [sic] it around and kept hitting over like I was missing his shoulder, sir. Then I pushed him back . . . turn to run, sir, and Turner was between me and the door, then he grabbed me. Gray grabbed me, sir."

Gray obtained a headlock on accused, "snatched" him back against the gun racks, "the knife pressing against my chest." The parties fell to the floor. At this point, according to accused, Gray was apparently stabbed in the area of his groin during a struggle over the weapon. He freed his hold on accused's hand, "and I snatched loose and ran."

Outside the barracks, accused continued his flight but, as noted above, was quickly apprehended.

Asked the purpose of his visit to the arms room, accused replied:

"Well, I just wanted to talk to him about my car, sir, I didn't want to hurt him, sir, I had no idea of doing anything to him. I just wanted to talk to him because I didn't want him pushing me around, sir."

Gray was "pretty strong" and accused knew he could not "beat him." Accused was "afraid of the guy" and took the knife "to have something in my protection . . . and I didn't want him to do anything to me." If "he come [sic] up to me I wanted to scare him back." The knife was "inside my pants" when accused entered the arms room and was not drawn until Gray struck him with his fist. Accused "didn't have a chance to say anything. . . . I walked in and everything went boom, boom, boom, like that."

In summary, then, the evidence adduced by the United States tends to establish that accused engaged in an argument with Gray, was assaulted; left and deliberately armed himself; and sought out his victim for the purpose of revenge. On the other hand, the accused's story, supported by Water's testimony, is that he armed himself only to protect his person against further attack by Gray; that he was afraid of Gray; that he sought Gray out only with the concept of further discussing their differences over accused's automobile; and that the knife was neither drawn nor used until Gray launched his unprovoked and strenuous attack upon him. In my opinion, this testimony clearly raised the issue of self-defense.

In United States v Black, supra, we found the evidence was sufficient to raise an issue of self-defense upon facts almost identical to those now before us. There, Black and Harris were also friends who fell out over a minor difficulty. Harris, a physically powerful individual, asked Black if he desired to fight and emphasized his pugnacious intent by shoving him several times. The incident occurred in front of Black's locker, and the latter seized a bayonet therefrom, turned, and stabbed Harris. In his pretrial statement, Black alleged fear of his victim and resort to the bayonet to "'scare him away,'" followed by its unintentional use.

Here, too, the victim, Gray, was physically powerful—"the strongest man" in his company—outweighing the accused by sixty-five pounds and towering over him by five inches. Instead of merely shoving Green, the victim had slapped him "hard." And, just as in *Black*, accused understandably feared the older, larger man. He was never shaken from his testimony that the knife was obtained solely to protect himself against a further assault and that he did not, in fact, draw it from underneath his clothing until he was attacked by Gray. Even then, accused, though subjected to a grueling cross-examination, steadfastly maintained that he intended merely to frighten Gray away and stabbed him unintentionally. That the court-martial attached credence to his version of the incident is emphasized by the returning of a verdict of involuntary manslaughter, thereby indicating it was unconvinced accused intended to inflict upon his former friend either death or grievous bodily harm.

The record before us is, therefore, essentially the same as that in *Black*, supra. And the language which we there used, at page 575, should be dispositive here:

"The Government argues, however, that the facts clearly show that it was unreasonable for the accused to fear either death or grievous bodily harm at Harris' hands and that his resort to use of a dangerous weapon constituted employment of such a brutally excessive force that he was thereby deprived of the right to claim that he acted in self-defense. With regard to the first proposition, reliance is placed on United States v Maxie, 9 USCMA 156, 25 CMR 418. That case does not so hold, for we were there concerned solely with the question whether an accused's honest but unreasonable belief that the infliction of death or grievous bodily harm was necessary to protect his own life or bodily integrity, i.e., 'imperfect self-defense' was sufficient to reduce the crime of murder to that of voluntary manslaughter. In holding that the degree of homicide was not so changed, we specifically adverted to the fact that the law officer had instructed the court members regarding the law of self-defense.

"Concerning its second contention, it is apparent the Government urges upon us the proposition that resort to a deadly weapon may never be had in face of a fistic assault. See United States v Straub, 12 USCMA 156, 30 CMR 156. There is no such unqualified rule, for *whether an accused, by resort to a weapon, uses excessive force in repelling an assault upon him is dependent upon all of the circumstances and is essentially an issue of fact to be determined by the jury.* Lujan v United States, 209 F2d 190 (CA 10th Cir) (1953); Davis v State, 152 Ind 34, 51 NE 928 (1898). As was remarked in the latter case, *the adoption of an absolute prohibition against the use of a deadly weapon to repel an unarmed assault would mean that 'the assaulted party must stand and take his chances of being knocked down and stamped into a jelly, or of being choked to death, before he can lawfully use a weapon in his defense.' We agree that such is not the law. Little men, as well as those physically more fortunate, are entitled to take reasonable measures in order to protect themselves.*" [Emphasis supplied.]

Emphasis is placed by my brothers on the fact that accused admittedly purchased a weapon and thereafter sought out Gray in the arms room. These facts are undoubtedly true, but what is overlooked is the purpose for which he

swore the weapon was obtained, *i.e.,* "protection," and his undoubted right to seek out Gray and attempt an amicable adjustment of their difficulties. Compare State v Bristol, 53 Wyo 304, 84 P2d 757. Concededly, this was use of poor judgment and we, as experienced appellate judges, recognize this at once, but, in gauging the accused's actions, we must look at them through the eyes of an eighteen-year-old boy of limited intelligence and poor background. So viewed, one can understand that he, as the court-martial found, did obtain the knife and go to Gray only for the purpose concerning which he testified. In any event, it ill behooves us now to weigh his credibility and reject testimony, the like of which we so recently held to raise an issue requiring instructions on self-defense. United States v Black, supra.

In sum, then, I am of the view that the evidence in this case clearly raises an issue of self-defense, demonstrating as it does—by accused's version—that he resorted to the knife only to protect himself against an extremely powerful person who suddenly attacked him. Perhaps, accused should have anticipated this course of events and stayed away, but his poor judgment does not, if his testimony be accepted, make the homicide less excusable than it was in *Black,* supra. The instructions on self-defense were, as my brothers concede, erroneous and, as the issue was here presented by the proof, prejudicially so. Accordingly, I register my disagreement with their conclusion.

I would order a rehearing at which the issue of self-defense might be submitted under proper instructions.