UNITED STATES, Appellee

v

ERNEST L. CARMON, Airman Third Class,
U. S. Air Force, Appellant

14 USCMA 103, 33 CMR 315

No. 16,499

June 28, 1963

*Captain Hugh J. Dolan* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel E. Henderson, Jr.,* and *Harland Tod Weaver, Esquire.*

*Major James Taylor, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis* and *Lieutenant Colonel John C. Wiley.*

## Opinion of the Court

FERGUSON, Judge:

After a Fort Worth, Texas, grand jury refused to indict accused, he was brought to trial before a general court-martial convened by the Commander, Second Air Force, charged with the unpremeditated murder of Airman Coy W. Witherspoon, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918. Found guilty of voluntary manslaughter, in violation of Code, supra, Article 119, 10 USC § 919, he was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for four years, and reduction. Intermediate appellate authorities affirmed, and we granted Carmon's petition for review on the questions whether the evidence placed self-defense in issue and whether the law officer's instructions on that doctrine were prejudicially erroneous.

Carmon and Witherspoon were assigned to the same unit at Carswell Air Force Base, Texas. They became friendly, and Witherspoon often used Carmon's motorcycle. In return, Carmon frequently borrowed Witherspoon's automobile. In December 1961, Carmon met Sue, who apparently had been dating Witherspoon. Using Witherspoon's car, accused began to see Sue regularly. He eventually proposed to her, was accepted, and gave her a ring.

Witherspoon learned of the accused's association with Sue. Enraged at what he considered to be a friend's perfidy, he wrote Carmon a letter and left it on his bed. In this missive, he disclosed his awareness of accused's relationship with Sue; that accused had used his automobile to facilitate his courtship; accused him of damaging the vehicle; and made plain his intention to even the score. *Inter alia,* he declared:

104

". . . Well, you can bet your life that you will pay for this mistake . . . you are the one who is coming out on the short end . . . you have had the course . . . You might ought to pick a buddy who is going to be a little easier on you . . . I don't give a . . . where it is, if I ever see you off base, I'm going to kick your . . . from one end to the other. Take that the way you prefer."

From that time until the day of their final, and fatal, encounter, Witherspoon harassed and threatened the accused. Testimony of various witnesses indicates that he once assaulted Carmon in his bed; on another occasion, he beat him up in the presence of others; and, on a third, he produced a knife and told accused he was going to cut him with it. At still another time, he broke a soft drink bottle in accused's presence and indicated it would serve handily to slash him. Repeatedly, he informed Carmon that he intended to kill him as soon as the opportunity presented itself.

According to accused, he became alarmed, and brought a pistol to the base from his home in order to protect himself and to use for hunting.

On the evening of February 8, 1962, Sue picked up accused at his station in her car. Accompanied by an Airman Moran, they left the base. Accused, armed with his pistol, was driving the vehicle. The party proceeded to a drive-in restaurant, where they obtained something to eat. Witherspoon appeared and began to circle the restaurant in his automobile. Apparently, he observed accused kiss Sue and became violently upset. When Carmon, Sue, and Moran drove off, he followed them. Their route led through a Fort Worth park.

Witherspoon pulled his car alongside that driven by accused, attempted several times to force him from the road, and shouted obscene threats and imprecations. In the park, he finally passed them at a high rate of speed, cut back in front of their car, and forced them to halt. At almost the same instant, he leaped from his vehicle, shouted that it was the accused's "last night," and that he was going to beat him to death.

Witherspoon wrenched open the door to Sue's car so violently that its lock plunger was broken. Although Carmon moved over against the other passengers on the front seat and attempted to keep Witherspoon from hitting him or dragging him from the automobile, the latter pulled him from the vehicle, striking him several times. In the struggle, the pocket and button of accused's shirt were torn away. Accused's arm was scratched, and, according to his testimony, one of the blows was so hard that he believed Witherspoon had something in his hand.

As he was being struck, accused produced his pistol, a single action .22 caliber revolver, and struck Witherspoon on the neck with its barrel. Carmon testified that Witherspoon then let him go, but immediately lunged forward again. At this point, he cocked the weapon and fired. Witherspoon fell to the ground, and accused reentered Sue's car. Moran jumped out, and the others left. Utilizing the victim's car, Moran transported him to the hospital, where he was pronounced dead. Accused was apprehended by civil authorities on the same evening at his barracks.

The law officer instructed the court-martial at length on the doctrine of self-defense. The following advice was included:

"With reference to the question of self-defense, which has been put in issue by the evidence, you are advised that the accused is excused for killing in self-defense if he believes on reasonable ground that the killing was necessary to save his own life or to prevent great bodily harm to himself. To be excused in killing in self-defense, a person must have believed on reasonable grounds that the danger of being killed himself or of receiving great bodily harm was imminent, and no necessity will exist until the person, if he is not in his own house or at a place where he has a duty to remain, has retreated as far as he safely can. Further, to avail himself of the right of self-defense,

the person must not have been the aggressor or intentionally provoked the altercation with the victim, but, if after provoking a fight, the person withdraws in good faith and his adversary follows and renews the fight, he is no longer the aggressor and may avail himself of the right of self-defense."

It cannot be gainsaid that there is in this record "some evidence" tending reasonably to place in issue the affirmative defense of self-defense. United States v Ginn, 1 USCMA 453, 4 CMR 45; United States v Black, 12 USCMA 571, 31 CMR 157; United States v Smith, 13 USCMA 471, 33 CMR 3. The Government's argument to the contrary is no more than an invitation "to apply the law . . . to the evidence before us and resolve all factual issues in the case against the accused." United States v Black, supra, at page 575. We decline to do so. The record makes crystal clear the victim's threats, his prior assaults upon the accused, his announced determination to beat him to death, with concomitant acts tending toward execution of that final expression of his purpose. The only real question presented by this record is whether the accused's reaction to the situation constituted an excessive use of force. This was a question of fact, which was required to be submitted to the court members under proper instructions. United States v Black, supra; United States v Smith, supra.

It is equally apparent that the advice to the court concerning self-defense—quoted in part above—was prejudicially erroneous in that it predicated the propriety of accused's use of a deadly weapon upon his having "retreated as far as he safely can." This instruction is identical to that which we condemned in United States v Smith, supra; United States v Hayden, 13 USCMA 497, 33 CMR 29; United States v Green, 13 USCMA 545, 33 CMR 77; and United States v Hubbard, 13 USCMA 652, 33 CMR 184. As we stated in those cases, failure to retreat is not "categorical proof of guilt, but is a circumstance to be considered with all the others in or-

der to determine whether an accused went further than he was justified in doing." United States v Hubbard, supra, at page 656. Reversal is, therefore, required.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

Considering the accused's own version of the events, I am unable to see how it adds up to anything but a criminal homicide. In its most favorable light, his story compels the conclusion that he got the gun as an "equalizer"; in its worst light, it shows he set the stage for the victim's death. See United States v Green, 13 USCMA 545, 549, 33 CMR 77. Briefly, this is the story.

Sometime after Christmas, Witherspoon told the accused he would not "bother" him "anymore on the base," but would wait until he caught him outside at which time he would beat him "to death." On January 31, Witherspoon had his first meeting with the accused off the base. Despite his repeated threats during the month, all he did, in the accused's own words, was the following:

"He knocked me against the top of the roof of . . . [Sue's] car, I believe it was. Then he grabbed my front of my shirt and pulled me where I was over the car. I sorta put my foot on the inside of the panel of the car to keep all my weight from being on my shirt. He was hitting me and telling me to fight, cussing me, and calling me names. I kept telling him I didn't want any trouble, to leave me alone."

It is worth noting the accused did not maintain he suffered any injury as a result of the beating, which a defense witness described as merely "slapp[ing] him around in a sort of boisterous, show-off way"; also, he made no report of the incident, although he had not hesitated to complain about other matters.

106

On February 2, the accused went from the base to his home, a distance of about eighty-five miles, to get the gun with which he later shot Witherspoon. On February 8, he arranged for a date with Sue, who, a few days before, had broken off their engagement. When Sue arrived in her car, Airman Moran asked her for a lift to his girl friend's house. Sue agreed to take him. When the accused got into the car he took over the driver's seat. Unknown to Sue and Moran, he placed his gun, which was fully loaded, on the floorboard of the car near his seat. Instead of taking Moran directly to his girl friend's house, the accused drove around town for a while; and then proceeded to a drive-in restaurant which he knew was frequented by Witherspoon. In any event, he appeared on the scene; and when he did, the accused took the occasion to kiss Sue. Witherspoon looked "mad." When the accused left the drive-in, Witherspoon followed calling out obscenities and inviting the accused to fight. What transpired after the two cars stopped is related by the accused as follows:

"Q. [IDC] What happened after that?

"A. He was still cussing me and trying to get the door open. I was backing away from him; I was trying to avoid his blows and was getting over on Miss Volsch, leaning over on her. All this time he was hitting on me. He succeeded in getting the door open and I braced myself on the side of the car. All the windows were down; he started pulling me out of the car. I saw he was going to pull me out and he just sorta went wild. I was trying to keep him from forcing me out of the car. I had my left arm over the door in the back and my right arm was on the door on my side.

"Q. Did you have anything in your hands?

"A. Yes, sir, I did. When I saw he was going to pull me from the car, I reached to the floorboard and got my pistol.

. . . . .

"Q. Airman Carmon, you told the

court what he said to you after he had you out of the car. What was going on during the time with reference to you and Witherspoon?

"A. I was trying to get away from him, sir.

"Q. Where did he have you?

"A. He had me by my shirt and was hitting me with his right hand, by the shirt with his left hand and hitting me with his right hand.

"Q. What was the result of his blows?

"A. It just happened in a matter of seconds, it didn't take very long; I know he hit me several times, but the length of time I was out of the car was a matter of seconds; I was trying to get away from him.

. . . . .

"Q. Tell the court how you got away from him?

"A. I swung at him with the gun, and I didn't known if I hit him or not. I sorta jerked myself back and we separated a few feet. He jumped at me again, just as I got away from him, he jumped at me again, and I fired the gun.

"Q. What did you do then?

"A. As soon as I fired the gun, I wheeled around and ran to the car, got in the car and left the scene, sir.

. . . . .

"Q. He had hold of you ever since he ran up to the car and stuck his hand in the car?

"A. Yes, sir.

"Q. When was the first time he turned you loose on that occasion?

"A. When I struck at him.

"Q. After you struck him, tell the court again what happened.

"A. As I struck at him, it separated us a few feet. As I got free from him just a second, I jumped back and shot at him, what I thought was him. . . .

"Q. Where was the gun when you pulled the trigger?

"A. From my hip, sir.

. . . . .

"Q. With reference to the time you pulled the trigger, when you

knew it was pointed in the direction of Coy Witherspoon, what was your intention?

"A. I was trying to get away, sir."

Again, it is most significant that the accused did not say anywhere in his extensive testimony that he believed he would suffer bodily harm unless he shot Witherspoon. He simply said that when he pulled the trigger, he was just "trying to get away." Get away from what—a few slaps in the face and some insults? True, at one point in his testimony, the accused indicated he was "pretty scared and shook up," but it is apparent that this state of mind resulted from the shooting, not Witherspoon's attack.

Here, as in United States v Green, supra, it compellingly appears that after being "humiliated" and "angered" by the victim, the accused armed himself with a deadly weapon in anticipation of meeting his tormentor again, and using the "equalizer." On the authority of the Green case, I would affirm this conviction. See also United States v Regalado, 13 USCMA 480, 33 CMR 12.

As to the instructions, there is, in my opinion, no fair risk they misled the court-martial. According to the accused, he was pulled from the car by Witherspoon, and was engaged in an active struggle with him, when the shot was fired. Under the circumstances, the doctrine of retreat is inapplicable. Consequently, if there were any deficiencies in the instruction on this point, they did not harm the accused. See my dissent in United States v Hubbard, 13 USCMA 652, 33 CMR 184.