UNITED STATES, Appellant

v

STERLING D. CAMPBELL, Commissaryman Third Class, U. S. Navy, Appellee

14 USCMA 383, 34 CMR 163

No. 17,187

January 31, 1964

*Major Daniel F. McConnell*, USMC, argued the cause for Appellant, United States.

*Lieutenant Colonel John R. DeBarr*, USMC, argued the cause for Appellee, Accused.

Opinion of the Court

KILDAY, Judge:

The accused was tried before a general court-martial convened at Newport, Rhode Island, by the Commander, Cruiser Destroyer Force, U. S. Atlantic Fleet. He was charged with having committed an assault with a dangerous weapon with intent to commit murder, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. Accused was found not guilty of assault with intent to commit murder, but by proper exceptions and substitutions was found guilty of aggravated assault by intentionally inflicting grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. He was sentenced to a bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for one year, and reduction to pay grade E-1. The convening authority approved the sentence as adjudged.

A board of review in the office of The Judge Advocate General of the Navy held the law officer erred in not instructing the court-martial on the law of self-defense. Accordingly, the board set aside the findings and sentence and directed that a rehearing might be ordered. The board of review subsequently denied a motion by appellate Government counsel for reconsideration.

Under the provisions of Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, Acting The Judge Advocate General of the Navy certified the case to this Court on the following issue:

"Was the Board of Review correct in holding that, under the circumstances of this case, the Law Officer erred in refusing to give the instruction on self-defense as requested by defense counsel?"

On the night of the occurrence here involved the accused, Campbell, returned to his ship from liberty at about 1:00 a.m. He was intoxicated. He proceeded toward his sleeping compartment to a point where a soft-drink machine and telephone were located opposite each other. The narrow passageway between

the telephone and the soft-drink machine was blocked by the injured party, Keahey, who was using the telephone. Keahey testified:

"Campbell pushed his way in, between the phone and the coke machine, and I told him to—I don't know the exact statement that I told him, but I said something to the effect, 'Watch yourself,' or 'What are you doing.' He made a smart remark back which I don't remember, but it started an argument right at the time which didn't last. Either I shoved him or he shoved me. Nobody hit anybody actually.

. . . . .

"Q. Were any blows struck?
"A. Not that I know of, sir. I wouldn't say there was.

"Q. Did you swing?
"A. Well, it's a—maybe I pushed him. I don't know about swinging or anything. I don't think I hit him."

At this juncture shipmates intervened and separated the two and they continued to swing at each other. It was necessary for accused to proceed along the passageway, past Keahey, to reach his sleeping compartment. The shipmates made two unsuccessful attempts to pass Keahey but were unable to do so because Keahey lunged at accused on each such occasion. Finally on the third effort, with other shipmates holding (or having "cornered") Keahey, they were able to get accused past Keahey and to his sleeping compartment. During the foregoing efforts accused got to the galley and secured a table fork which he took with him to his sleeping compartment.

There is evidence that accused was slugged by Keahey near the soft-drink machine. As accused went down the ladder he said to Keahey, " 'I'm afraid of you,' " and Keahey replied, " 'I'm afraid of you, too.' " When accused reached his sleeping compartment, several shipmates induced him to give up the fork. Accused was agitated and made statements as to what he would do to Keahey. He was finally calmed down by his shipmates and prepared to retire. He placed his clothes on his own bunk and placed the covers over them to give

the appearance that he was in his bunk sleeping. Government witnesses testified accused at the time said he did this to prevent being attacked in his sleep by Keahey. Having so arranged his bunk, accused retired to the bunk of another member of the crew, being the top bunk of a tier of three bunks, even though lower bunks were available.

Some time thereafter, perhaps an hour after the earlier encounter at the soft-drink machine, Keahey entered the sleeping compartment, proceeded to his own bunk and turned on his bunk light. When Keahey turned on his light accused inquired " 'Is that you, Stubbs?' " Keahey replied, " 'No, it's Keahey.' " Keahey testified that he then turned around and, as he turned, accused cut him across the face with what he thought to be a razor. Another witness, Moran, testified that when accused inquired " 'Is that you, Stubbs,' " Keahey replied, " 'No, my name is Keahey,' " and took a step toward accused and the two began to fight. Accused and Keahey fell to the floor with Keahey on top of accused. Keahey yelled, " 'Get him off me! He's got a razor.' " Accused yelled " 'Get him off me! He's trying to strangle me! He's trying to choke me!' " The combatants were separated. Keahey turned on the large light, looked in the mirror, saw that he was bleeding, immediately returned to accused, who was sitting on the floor, and kicked accused in the face three times. At each kick a petty officer first class pushed Keahey away from accused and finally terminated the kicking. Both Keahey and accused were sent, in separate ambulances, to the dispensary or naval hospital for medical attention.

As a witness, Keahey volunteered that for two years he was a member of a high school championship wrestling team. It was established beyond dispute, by shipmates, that while accused was given to tough talk when intoxicated, he had never committed an act of violence but was a passive individual. On the other hand, Keahey bore an opposite reputation. Keahey admitted that, at the time of this occurrence, he was restricted to the ship in accordance with the sentence of a summary court-

martial on a charge of violation of Article 95, Uniform Code of Military Justice, 10 USC § 895, resisting being lawfully apprehended by the armed forces police in Boston. He also admitted that in connection with that offense it had been necessary for the armed forces police to subdue him with arm locks and to apply hand irons in order to take him into custody.

The defense called as a witness, an officer candidate seaman. He testified he had served aboard the same vessel on which this incident occurred for a year with both accused and Keahey, was serving with them at the time of this occurrence, and knew both of them well. He had received an A. B. degree with a major in Protestant religion and minor in psychology. He testified, without objection, that accused was not the sort of person who "looked to get into fist fights"; that he felt he was a person who would try to avoid a fight rather than seek one; that he thought of accused as a sort of "pathetic person," a "very lonely person"; that he was not aware he had many friends; that though he had observed accused on the beach for over a year, he never saw him pick a fight; and that he had seen accused on the beach under circumstances where other men aboard the ship or other men in the Navy would have been in a fight while accused walked away from it.

As to Keahey he testified:

". . . I had the impression that he sort of enjoyed having the reputation of the tough guy, you know. And I can think of instances where I—I had words with him, nothing serious, but they were little things. Maybe just cutting in the chow line. I always had the impression that although I got along with him all right, I never had any problems, he was a little cocky; he carried a chip on his shoulder."

Individual defense counsel requested the law officer to give an instruction on the law of self-defense and, during an out-of-court hearing at which the question was discussed at length, insisted that the same be granted. The law officer ruled that accused was the ag-

**386**

gressor and that self-defense was not reasonably raised by the evidence. No instruction on self-defense was given to the court-martial.

We agree that when it is established the accused is the aggressor, he is not entitled to assert self-defense. United States v Brown, 13 USCMA 485, 492–3, 33 CMR 17, and authorities there cited. However, in the case before us an issue of fact exists as to whether accused or the injured party was the aggressor. This issue of fact is for the determination of the court-martial under proper instructions by the law officer.

It is to be noted that Keahey, in speaking of the incident at the soft-drink machine and telephone, complained that accused "barged in" and made a smart remark when Keahey said something to the effect " 'Watch yourself,' " or " 'What are you doing.' " Keahey equivocated when asked whether he had swung at accused and admitted "maybe I pushed him." Neither Keahey, nor any other witness testified that accused had in anywise attacked Keahey at that time. The evidence is undisputed that Keahey remained aggressive, and it required a number of shipmates to restrain him and to get accused past him. There is independent testimony that Keahey slugged accused in that encounter.

While Keahey testified that accused cut him immediately after he turned around, another witness testified that Keahey took a step toward accused before they began to fight in the sleeping compartment. It is significant that Keahey, the champion wrestler, was on top of and astride accused when they had fallen to the deck between the bunks. And we note that the injuries suffered by accused were substantial, and seem to have been even more serious than the cut inflicted on Keahey. See United States v Smith, 13 USCMA 471, 33 CMR 3. The relative fighting abilities, temperament, and proclivity for fighting are among the proper considerations in the determination of who may have been the aggressor and

whether self-defense was reasonably raised by the evidence.

Accused stated he was afraid of Keahey, and his actions between the original scuffle and the fight in the sleeping compartment could be reasonably so construed by the triers of fact. The incident of accused in placing his clothes in his bunk, under the covers thereof, while he retired to another bunk, is subject to different constructions. The law officer, during the out-of-court hearing on instructions, seemed to construe that action as being incriminating. The triers of fact could also have reasonably construed that action as an attempt to avoid injury at the hands of Keahey, as accused stated his purpose to be.

The board of review quoted at length from the evidence in the record, analyzed it, and came to the ▪ conclusion that the same reasonably raised the issue of self-defense, and that issue should have been submitted to the court-martial.

We agree. We cannot surmise what the findings of the members of the court-martial may have been had they been properly advised on the possible applicability of self-defense. In that connection, it may be noted that, although accused was originally charged with an offense punishable by twenty years' confinement, the court-martial convicted him only of a lesser crime carrying a five-year maximum, and sentenced him to but one year's confinement, together with accessory penalties.

This Court has had occasion, recently, to review a number of cases involving the issue of self-defense. The following are among them and we refer to them generally for consideration of the questions here involved: United States v Acosta-Vargas, 13 USCMA 388, 32 CMR 388; United States v Smith, supra; United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Brown, supra; United States v Hayden, 13 USCMA 497, 33 CMR 29; United States v Duckworth, 13 USCMA 515, 33 CMR 47; United States v Campbell, 13 USCMA 531, 33 CMR 63; United States v Green, 13 USCMA 545, 33 CMR 77; United States v Hubbard, 13 USCMA 652, 33 CMR 184; United States v Carmon, 14 USCMA 103, 33 CMR 315; United States v Gordon, 14 USCMA 314, 34 CMR 94.

The certified question is answered in the affirmative, and the decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The undisputed evidence shows the accused told others he had a knife, and that he was going to kill Keahey. He "swore to God" Keahey would "be dead before morning." Keahey came down to the sleeping compartment to go to bed. He turned on the light, went to his own bunk, and started to remove his jacket. He heard a voice calling out either his name or the name "Stubbs." He "just turned around" and "didn't even take a step or anything" when he was cut across the face. Not until later did he know that the person who cut him was the accused; and that the instrument he used to do the cutting was a knife. On this evidence the accused was plainly guilty of a vicious and unprovoked assault. The majority, however, say there is sufficient evidence of self-defense to require an instruction on that issue.

To reach their conclusion the majority refer to the accused's statement that he was "afraid" of Keahey. That statement was made about an hour before the incident which resulted in the charge. The majority also refer to differences in the respective personalities and pugilistic abilities of the parties. These circumstances would be entitled to some consideration if there was any evidence to show the accused's fear of bodily harm moved him to use the knife against Keahey. I have scrutinized the record of trial in vain for such evidence.

I have already referred to the accused's threats against the victim. There are other significant facts to show incontrovertibly that the accused was the aggressor. The incident did not take place around the accused's bunk but around Keahey's. And to get to that place the accused had to leave

**387**

the bunk to which he had retired after he had arranged his own bed to make it seem as though someone was in it. All the evidence is to the effect that Keahey was merely preparing for bed and had had nothing to do with the accused, when the accused called out either his name or the name of Stubbs to attract Keahey's attention. One witness said Keahey took a step forward after he turned around in response to the call; Keahey testified he "just turned around . . . didn't even take a step or anything" when he was cut. The difference is unimportant. There is absolutely nothing to show menace in Keahey's movement; and he testified he didn't know who called him. There is absolutely nothing to show the accused feared that Keahey's step forward would culminate in an actual assault against him. On the contrary, the speed of the accused's own movement, and the fact that he had ready a knife with a bared blade, belie all possibility that he acted out of fear of personal injury.

I agree completely with the law officer that there is a total absence of any evidence justifying an instruction on self-defense. I would therefore answer the certified question in the negative, and return the record of trial to the board of review for further proceedings.