UNITED STATES, Appellee

v

ELVIN R. VAUGHN, Private First Class,
U. S. Army, Appellant

15 USCMA 622, 36 CMR 120

No. 18,766

January 28, 1966

*First Lieutenant John Kagel* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker,* and *Captain Robert T. Webster.*

*Captain Richard J. Andriolo* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain William L. Leonard.*

## Opinion of the Court

KILDAY, Judge:

Accused was arraigned before a general court-martial convened at Fort Campbell, Kentucky, on a charge of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He pleaded not guilty, but was convicted as charged by the court-martial and sentenced to dishonorable discharge, total forfeitures, reduction to the lowest enlisted grade, and confinement at hard labor for life. The conven-ing authority approved the conviction and the sentence as adjudged.

Thereafter, a board of review in the office of The Judge Advocate General of the Army, acting within its authority under Article 66(c), Uniform Code of Military Justice, 10 USC § 866, reduced the findings to voluntary manslaughter, in violation of Article 119(a), Uniform Code of Military Justice, 10 USC § 919, as the board members were not convinced beyond a reasonable doubt that the

killing was not done in the heat of sudden passion caused by adequate provocation. The board reassessed accused's sentence at dishonorable discharge, total forfeitures, reduction, and confinement at hard labor for ten years.

Upon accused's subsequent petition to this Court for grant of review under Article 67(b)(3) of the Code, 10 USC § 867, we set the case down for briefs and argument in order to consider whether the issue of self-defense was reasonably raised by the evidence, and whether the law officer's instructions thereon were correct.

As we noted in United States v Gordon, 14 USCMA 314, 321, 34 CMR 94, in discussing the standard for determining whether an issue of self-defense is reasonably raised by the evidence:

"... The burden of proof beyond reasonable doubt is on the Government, and if there is in the record evidence which, if credited, could raise a reasonable doubt whether the accused acted in self-defense, then the law officer is obligated to appropriately frame that issue and submit it for resolution to the triers of fact."

Viewing the evidence on that basis, we turn to an examination of the record.

The transcript reflects that accused and the victim, Stewart, together with several others, were involved in an afternoon crap game in the barracks. An "E-5" came by and broke up the dice game, whereupon Stewart invited the players into his room, and the gaming continued. After a time the others dropped out, and only accused and Stewart were left gambling against one another. Stewart ended up losing all his money to accused, and at that point an argument broke out between the two. Accused's winnings from all players totaled over $400.00, and Stewart grabbed some $145.00 that the former had in his hand. The two began fighting over the money, with accused calling for assistance. According to accused, Stewart had him pushed back on a bunk and was choking him. When Stewart went to pick up the money, which had dropped to the floor, accused ran to the door and opened it.

The charge of quarters had responded to the disturbance. He heard the commotion in Stewart's room and tried the door, but it was locked. He was right outside when accused got the door open and asked him to summon the military police. At that time Stewart, who appeared to be the stronger and larger of the two, grabbed accused in a bear hug and the fighting and arguing over the money continued.

The charge of quarters immediately reported the incident to the battalion duty officer, who went to the scene. According to this lieutenant's stipulated testimony, accused claimed Stewart had taken $145.00 from him, whereas Stewart asserted he was cheated and insisted accused owed him $80.00 more. The duty officer told them they had made a mistake gambling, counseling them to let things stand as they were, and forget the matter before they got into serious trouble. Accused seemed agreeable to this, but some five minutes later the lieutenant saw the two talking outside, and interceded again. Accused told the officer he was willing to drop the matter to avoid trouble, and he wanted Stewart to leave him alone. Stewart was less agreeable and said he was going to get his $80.00. The latter commented that he had been in trouble before. The lieutenant once more separated the two, telling Stewart to go to his room, and allowing accused to proceed on a personal errand with the admonition to stay away from Stewart.

According to the accused, after the officer initially counseled them in his office he left, but Stewart followed him outside and voiced his desire to "finish" it. Stewart had put his hand in his pocket and accused turned to walk away when the lieutenant again interceded. Accused once more stated his willingness to forget the matter, and his desire that Stewart leave him alone. As accused walked away, two soldiers who apparently had observed

this last encounter advised him he had " 'better be careful, Stewart is from the city, you'll wind up with a knife in your back.' "

A week earlier, accused claimed, a soldier had observed as Stewart walked by, " 'Stay clear of him; he's the leader of that gang that was in those fights in Evansville.' " Further, a policeman testified he had seen Stewart at the head of a group of people carrying a bloodstained baseball bat in that city. There was also evidence that accused was a peaceful and quiet individual, whereas Stewart had a reputation for being overbearing and for aggressiveness and violence.

From the time Stewart attacked him in the room, accused said he was afraid of him. He feared Stewart might kill him and did not want to return to his barracks without a weapon. He decided he needed a pistol to protect himself from Stewart. That same night accused went off post and bought a four barrel small bore derringer-type pistol which he had with him when he returned to his quarters.

Early the following morning, accused placed the pistol in the pocket of his field jacket. After he had eaten and completed a detail to which he was assigned, accused was sitting in his barracks bay going over notes in preparation for an examination. A soldier came up to him relaying a message from Stewart that the latter wanted to see accused. This frightened accused, he testified, and he hesitated, but he put on his field jacket and went into the hall. Stewart was waiting for him there and told him to come into his room where they would "finish it." Accused demurred, and the two argued in the hallway, with Stewart claiming he was cheated and accused replying he was not and stating that " 'The only way to finish it right is to give me my money back.' "

Stewart continued to insist that they go into his room to "finish it," but accused broke off the argument and went to seek out his squad leader. Accused testified he was afraid of

Stewart, did not believe the latter would "get off . . . [his] back," and was afraid to go into the room without a witness. Accused found his squad leader and told him he wanted him to witness a conversation with Stewart. The squad leader followed accused out into the hall where the latter had rejoined Stewart, saying:

" '. . . this is my witness, if I go into your room I'll have to have a witness to hear the conversation.' "

Stewart protested, " 'No, no, we don't need a witness,' " and again suggested going into the room to "finish" it.

The squad leader, at this time, had poked his head into the nearby room of the platoon sergeant, and was momentarily diverted. Accused testified that as Stewart made the last-quoted statements, the latter put his hand in his pocket and advanced toward him. Accused put his hand in the pocket of his field jacket and looked around for his squad leader. When accused looked back, Stewart's hand was coming out of his pocket "real fast." Stewart was coming at accused, and was "real close."

At that point accused drew the pistol and fired at Stewart. One of the shots perforated the aorta, causing Stewart to bleed to death.

Accused testified he was afraid Stewart was going to kill him, as the ultimate victim had indicated to the battalion duty officer he did not fear further difficulty since he had been in trouble before, and continued to insist "it was not finished." Accused was afraid to go into Stewart's room alone, and stated there would have been no reason to do so had Stewart only desired to talk to him. Even with the pistol in his pocket he feared Stewart, and said he shot "to stop him from hurting me."

The foregoing recitation from the record is not, of course, complete. There is other evidence in the transcript that strongly controverts accused's claim that he acted in self-defense. Moreover, we

are not unaware that inferences adverse to accused's claim, as well as favorable to it, may be drawn from the facts related. As previously noted, however, those considerations are unimportant for the purpose of this issue. If there is evidence in the record which, if believed, could raise a doubt whether the accused acted in self-defense, then the issue is reasonably raised and instructions must be given thereon. United States v Gordon, supra. In light of the posture of the record, we have no difficulty concluding that the law officer was correct in submitting the question to the court members for them to resolve. We turn, therefore, to an evaluation of the instructions he gave on the issue.

The advice given to the court-martial with regard to the question is as follows:

"Now the court is advised that there is an issue of fact as to whether the accused was the aggressor or not. If you conclude that the accused was the aggressor and remained so throughout the final altercation, then the balance of this instruction on self-defense is not applicable. If you find that self-defense is not in issue, the reputation of Stewart for violence is of no consequence other than its possible effect on voluntary manslaughter.

"Self-defense, if so found by you, pursuant to the following instructions, would make the shooting of Stewart excusable.

"You are advised that a person may lawfully meet force with force in protecting himself, and that such person has the right to exercise and use such force as may honestly and reasonable [sic] appear to him, under all the circumstances, necessary to protect himself from death or to prevent great bodily harm to himself, even though he may not have been actually in such danger. Self-defense is a plea of necessity.

"If you determine that Stewart made a threatening gesture which may have lead [sic] Vaughn to believe that Stewart had a knife, then I tell you that the accused may meet force with greater or different force. Even if Stewart had no weapon, the accused may use a gun, not only as a deterrent, but *if* laboring under great fear or apprehension of death or great bodily harm he may use greater force.

"In determining if the use of the gun was justified against the claimed aggressor, Stewart, you should consider all the circumstances of the case. Amongst these circumstances are the size of Stewart vis-a-vis Vaughn, the locale where the incident occurred, the proximity of help, and the possibility of retreat. In that connection, I tell you that the retreat and help possibilities are only circumstances to be considered in connection with all the others. If the accused reasonably believed he was in danger of great bodily harm, he was entitled to stand his ground and meet force with force regardless of retreat possibilities or the proximity of help. Also, you should consider the relative fighting abilities of the parties, their temperaments and proclivity for violence, the threats, if any, voiced by Stewart, and his previous altercation with Vaughn the day before.

"Now the accused has testified he saw no weapon in the hands of Stewart, but if the accused is to be believed the situation was fluid and fast-moving. Under some circumstances one can reasonably be put in fear of death or grievous bodily harm without being attacked with a weapon.

"Other factors to be considered are the initial or continued resistance, if any, offered by Stewart; the number of shots fired; and Stewart's belligerence, if any. All the circumstances of the case must be considered in determining this issue.

"Now for the defense of self-defense to be available to the accused, he must not have been the aggressor or intentionally provoked the altercation with the victim and

the degree of force employed by the accused in repelling the attack must not have exceeded that degree of force which the accused honestly and reasonably believed from all of the circumstances as they appeared to him at the time to be necessary to protect himself from apparent or actual bodily harm.

"It is your duty as members of the court to determine whether the accused's resort to the gun, under all the circumstances as they honestly appeared to him at the time, constituted the use of reasonable force.

"Now self-defense is a complete defense to the offenses of murder and voluntary manslaughter. The burden is on the prosecution to establish the accused's guilt beyond a reasonable doubt. Consequently, unless you are satisfied beyond a reasonable doubt that the accused did not act in self-defense, you must find the accused not guilty."

The above instructions fairly reflect a careful effort by the law officer to properly tailor his advice in the case at bar to the evidence developed at trial and to cover the accused's theory as to self-defense. He is to be commended for his diligent attention to our admonition in United States v Smith, 13 USCMA 471, 33 CMR 3. In that connection, we note that at the end of the next to last day of trial, the law officer held an out-of-court hearing wherein he discussed generally with counsel the instructions he believed to be appropriate, and considered their positions and requests. Next morning, prior to meeting with the court members in open session, the law officer again met with counsel and considered with them his proposed instructions, which he had reduced to written draft form. Such degree of care and effort is certainly highly meritorious, although we are cognizant the same may not be possible in all cases.

No objection to the law officer's instructions was voiced by the defense at trial, either by appointed defense counsel or individually requested military defense counsel. Before this Court, however, it is asserted on accused's behalf that the advice improperly restricted accused as to the quantum of force he might exercise in self-defense. Specifically, they single out as prejudicially erroneous, the charge that:

"It is your duty as members of the court to determine whether the accused's resort to the gun, under all the circumstances as they honestly appeared to him at the time, constituted the use of reasonable force."

That advice is wrong, the defense argues, because it limits the amount of force to which accused might resort against Stewart, whereas:

". . . one who 'in fact, and on reasonable grounds, fear[s] imminent death or serious injury,' is entitled to resort to deadly force in self-defense." [United States v Gordon, supra, at page 321.]

Standing by itself, the single paragraph quoted from the law officer's instructions referring to reasonable force could mislead the triers of fact, for they might conclude a purely objective standard—that of the hypothetical reasonable man—governed the force to which the accused might permissibly resort. Cf. United States v Jackson, 15 USCMA 603, 36 CMR 101.

That paragraph, however, does not stand alone. Taken in context, the entire charge on self-defense is not prejudicially misleading, and we cannot accept the contention that the statement requires reversal on the instant question.

The problem of self-defense has been before this Court on many occasions recently. See United States v Acosta-Vargas, 13 USCMA 388, 32 CMR 388; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Brown, 13 USCMA 485, 33 CMR 17; United States v Hayden, 13 USCMA 497, 33 CMR 29; United States v Duckworth, 13 USCMA 515, 33 CMR 47; United States v Campbell, 13 USCMA 531, 33 CMR 63;

United States v Green, 13 USCMA 545, 33 CMR 77; United States v Hubbard, 13 USCMA 652, 33 CMR 184; United States v Gordon, supra; United States v Campbell, 14 USCMA 383, 34 CMR 163; United States v Judkins, 14 USCMA 452, 34 CMR 232.

Those opinions spell out the standards by which issues of self-defense must be gauged, and make it clear that the same is governed by both objective and subjective considerations. Reference to them makes it clear that the quantum of force to which resort may be made against an assailant in a homicide case is a subjective aspect of the defense. Thus, in United States v Smith, supra, this Court unanimously held:

"... one is entitled, in self-defense, to use such force as *he believes* on reasonable grounds to be necessary, in view of all the circumstances of the case, to prevent impending injury." [Emphasis supplied.] [United States v Smith, supra, at page 474.]

Likewise, in *Regalado*, supra, we noted that while detached reflection is not demanded under pressure or in a fluid, fast-moving situation:

"... one must in fact, and on reasonable grounds, fear imminent death or serious injury before he is entitled to resort to a dangerous weapon." [United States v Regalado, supra, at page 484.]

Later, in the *Gordon* case, supra, immediately prior to the statement cited by appellate defense counsel and in connection with it, we voiced approval of this statement:

"'The guiding principle in invoking self-defense is utilizing the force which is honestly and reasonably thought necessary by one who believed the danger of death or great bodily harm was imminent.'" [United States v Gordon, supra, at page 321.]

See also Perkins, Criminal Law, page 885 (1957); and United States v Green, supra.

The law officer's instructions in the case at bar comported with the above standards, and with the other principles spelled out in the other authorities collated herein. In nowise did his advice mislead the court members to conclude that accused was foreclosed from shooting Stewart in self-defense, nor can it be said that any other standard than accused's assessment of the situation was to be controlling as to the quantum of defensive force.

We hold that the law officer's instructions properly submitted the issue of self-defense to the triers of fact, and therefore reject this claim of error.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.